**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | | |
|---|---|---|
| Jeffrey A. Guyer, | : | Case No. 3:12 CV 2519 |
|     Plaintiff, | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| Commissioner of Social Security, | : | **REPORT AND** |
|     Defendant, | : | **RECOMMENDATION** |

## I. INTRODUCTION

Plaintiff Jeffrey A. Guyer ("Plaintiff") seeks judicial review pursuant to 42 U.S.C. § 405(g) of

Defendant Commissioner's ("Defendant" or "Commissioner") final determination denying his claim

for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II

and XVI, respectively, of the Social Security Act, 42 U.S.C. §§§ 416(i), 423, and 1381 (Docket No. 1).

Pending are the parties' Briefs on the Merits (Docket Nos. 15 and 16) and Plaintiff's Reply (Docket

No. 17). For the reasons that follow, the Magistrate recommends the opinion of the Commissioner be

affirmed.

1

## II. PROCEDURAL BACKGROUND

On April 3, 2009, Plaintiff filed an application for a period of DIB under Title II of the Social Security Act, 42 U.S.C. §§ 416(i) and 423 (Docket No. 11, p. 150 of 480). On April 15, 2009, Plaintiff filed an application for SSI under Title XVI of the Social Security Act, 42 U.S.C. § 1381 (Docket No. 11, p. 157 of 480). In both applications, Plaintiff alleged a period of disability beginning July 9, 2008 (Docket No. 11, pp. 150, 157 of 480). Plaintiff's claims were denied initially on June 23, 2009 (Docket No. 11, pp. 81, 88 of 480), and upon reconsideration on November 19, 2009 (Docket No. 11, pp. 97, 103 of 480). Plaintiff thereafter filed a timely written request for a hearing on January 19, 2010 (Docket No. 11, p. 110 of 480).

On February 24, 2011, Plaintiff appeared with counsel for a hearing before Administrative Law Judge Timothy Belford ("ALJ Belford") (Docket No. 11, pp. 21-52 of 480). Also appearing at the hearing was an impartial Vocational Expert ("VE") (Docket No. 11, pp. 42-51 of 480). ALJ Belford found Plaintiff to have a severe combination of disc herniation at L5-S1, status post spinal fusion, obesity, and Major Depressive Disorder with an onset date of July 9, 2008 (Docket No. 11, p. 58 of 480).

Despite these limitations, ALJ Belford determined, based on all the evidence presented, that Plaintiff had not been disabled within the meaning of the Social Security Act at any time from the alleged onset date through the date of his decision (Docket No. 11, p. 67 of 480). ALJ Belford found Plaintiff had the residual functional capacity to perform light work with the following exceptions:

1.      Lift, carry, push, and pull twenty pounds occasionally and ten pounds frequently

2.      Limited to standing for four hours during an eight-hour workday

3.      Limited to walking for two hours during an eight-hour workday

2

4.     Limited to sitting for six hours during an eight-hour workday

5.     Requires a sit/stand option

6.     Limited to only occasionally climbing ramps or stairs, stooping, crouching, kneeling, and crawling

7.     Only occasional overhead reaching of not more than five pounds

8.     Limited to simple routine work with only occasional interaction with the public

(Docket No. 11, p. 60 of 480). Plaintiff's request for benefits was therefore denied (Docket No. 11, p. 67 of 480).

On October 9, 2012, Plaintiff filed a Complaint in the Northern District of Ohio, Western Division, seeking judicial review of his denial of DIB and SSI (Docket No. 1). In his pleading, Plaintiff alleged the ALJ erred by failing to: (1) address Plaintiff's numerous medications; (2) abide by the treating physician rule; (3) specify the specific requirements of Plaintiff's sit/stand option; (4) find Plaintiff was limited to sedentary work, given his limited ability to reach overhead; (5) assign Plaintiff's subjective statements full credibility; (6) properly consider Plaintiff's obesity; (7) pose an accurate and complete hypothetical question to the VE; and (8) demand more specific employment numbers from the VE (Docket No. 15). Defendant filed its Answer on January 4, 2013 (Docket No. 10).

### III. FACTUAL BACKGROUND

#### A.     THE ADMINISTRATIVE HEARING

An administrative hearing convened on February 24, 2011, in Toledo, Ohio (Docket No. 11, pp. 21-52 of 480). Plaintiff, represented by attorney David Friedes, appeared and testified (Docket No. 11, pp. 24-41 of 480). Also present and testifying was VE Dr. Vanessa Harris ("Dr. Harris") (Docket No. 11, pp. 42-51 of 480).

3

1.  **PLAINTIFF'S TESTIMONY**

Plaintiff testified that he resided alone (Docket No. 11, pp. 24-25 of 480). He did not graduate from high school and denied earning a GED (Docket No. 11, pp. 25, 40 of 480). Plaintiff did receive vocational training for auto mechanics (Docket No. 11 p. 25 of 480). Plaintiff has his driver's license and can drive, although he has difficulty with long distances (Docket No. 11, p. 36 of 480). Prior to his alleged disability, Plaintiff worked as an auto mechanic for Campbell's Soup Company for eighteen years (Docket No. 11, p. 25 of 480). He currently has long-term disability (Docket No. 11, p. 26 of 480). When asked what prevented him from returning to work, Plaintiff testified he has lower back problems, including stabbing pains down his legs, and numbness and tingling in his feet (Docket No. 11, p. 26 of 480).

Plaintiff gave testimony concerning a number of his alleged impairments, including his back pain and depression (Docket No. 11, pp. 24-41 of 480). With regard to his back pain, Plaintiff stated he had surgery, but his pain has since gotten worse (Docket No. 11, pp. 26-27 of 480). Any activity aggravates the pain, which is constant (Docket No. 11, p. 27 of 480). He sometimes obtains relief by laying on his side with a pillow between his knees (Docket No. 11, p. 27 of 480). Plaintiff is on a variety of medications for his back pain, including Neurontin, Gabapentin, and Vicodin (Docket No. 11, p. 27 of 480). Plaintiff testified that, as a result of the Vicodin, he becomes tired, drowsy, forgetful, and dizzy (Docket No. 11, p. 31 of 480). This drowsiness requires Plaintiff to take up to three one to two-hour naps during the day (Docket No. 11, pp. 31, 37 of 480). Plaintiff was sent for acupuncture therapy, but testified he did not obtain any relief (Docket No. 11, p. 27 of 480). Plaintiff has difficulty bending forward, and is only able to lean forward a quarter to halfway before the pain becomes too much (Docket No. 11, pp. 29, 31 of 480). Plaintiff also indicated he has difficulty reaching above his

4

head (Docket No. 11, p. 29 of 480).

When asked about his mental health, Plaintiff testified he suffers from depression because of his back issues (Docket No. 11, p. 32 of 480). He has some difficulty with memory and retaining information he reads (Docket No. 11, pp. 35, 40 of 480). Plaintiff also testified he has lost weight because he has not had much of an appetite (Docket No. 11, p. 39 of 480). Plaintiff was prescribed Fluoxetine[1] for his depression (Docket No. 11, p. 32 of 480).

### 2.    VOCATIONAL EXPERT TESTIMONY

Having familiarized herself with Plaintiff's file and vocational background prior to the hearing, the VE described Plaintiff's past work as a maintenance mechanic as heavy and skilled (Docket No. 11, p. 235 of 480). ALJ Belford then posed the following hypothetical question:

> I want you to consider [a] hypothetical individual limited to light exertional work. That would be limited to occasional climbing [of] ramps or stairs, occasional stooping, crouching, kneeling and crawling with only occasional overhead reaching not more than five pounds. Further limited to simple routine work with only occasional interaction with the public. Would there be any jobs in the national economy that such an individual could perform?

(Docket No. 11, p. 42 of 480). Taking into account these limitations, the VE testified there was other work the hypothetical person could perform, including: (1) binder, listed under DOT[2] 920.687-190, for which there are 499,800 positions nationally and 4,900 regionally; (2) wrapper, listed under DOT 318.687-018, for which there are 521,000 positions nationally and 3,200 regionally; and (3) injection mold machine tender, listed under DOT 556.685-086, for which there are 135,700 positions nationally and 1,000 regionally (Docket No. 11, pp. 42-43 of 480).

---

[1] A generic version of Prozac. MOSBY'S MEDICAL DRUG REFERENCE (2002).

[2] Dictionary of Occupational Titles.

5

ALJ Belford then added to his hypothetical, stating "[i]f there is a further restriction in that . . . the hypothetical individual would need the ability to change positions from a standing to a sitting position on an as needed basis, would he be able to perform any of those jobs?" (Docket No. 11, p. 43 of 480). Dr. Harris indicated an individual "could actually sit or stand at will and employers have stools and benches in the work place" for these provided positions (Docket No. 11, p. 43 of 480). She further indicated this restriction would not reduce the number of available jobs, based on her experience in the field (Docket No. 11, p. 43 of 480).

The ALJ again added to his original hypothetical, stating:

I want you to consider an additional limitation where they would be able to do light work . . . with the exception of . . . only be able to stand for four hours in an eight hour day total and would only be able to walk for two hours in an eight hour day total. Would that change any of the available number of these jobs?"

(Docket No. 11, pp. 43-44 of 480). The VE indicated this additional limitation would not change the jobs available (Docket No. 11, p. 44 of 480).

On cross-examination, counsel provided a very lengthy hypothetical question, summarized as follows:

So let me give you a hypothetical if you will. I'm going to give you one based on pretty much the sit stand and physical requirements that the judge [gave] to you but I'd like you to also assume that this person should not squat at all, should not crawl at all, should not climb at all. I'd like you to assume that the person has moderate restrictions against moving machinery, changes in temperature, humidity, driving, dusts, fumes and gases.

From a mental stand point . . . [a]ssume for me that severe and extreme ability to function in most areas due to continuous impairments . . . Assume that the areas that I'm talking about mental limitations would be an inability to maintain safety [of] self and others for example fear of suicidal thoughts, homicidal urges, self destructive behaviors.

The ability to . . . do goals, carry out things perform things in a timely manner, meet expectations is only moderately limited . . . and . . . be able to comprehend and follow instructions being moderately affected. Maintain work pace, production work load expectations moderately impaired and respond appropriately to supervision . . . moderately

6

[impaired] and performing work and contacting with others . . . mildly limited. Moderately again, the ability to generalize, evaluate and make independent decisions . . . able to interact with customers . . . moderately [impaired]; ability to accept and carry out responsibility, direction, control and planning tasks moderately [impaired]. Perform complex tasks requiring higher levels moderately [impaired]; supervise and manage others moderately [impaired].

If you put them altogether would such an individual . . . be able to carry out the kinds of work that you've indicated as alternate work?

(Docket No. 11, pp. 45-48 of 480). The VE responded in the negative because the individual would be off task one-third to two-thirds of the day (Docket No. 11, p. 48 of 480).

## B.   MEDICAL RECORDS

Plaintiff's medical records date back to April 26, 2005, when Plaintiff saw Dr. Scott T. Dull, MD ("Dr. Dull") complaining of constant lower back pain and intermittent leg and foot pain (Docket No. 11, p. 282 of 480). Plaintiff's gait was slow but steady and he displayed a negative straight leg raise[3] and Patrick test[4] (Docket No. 11, p. 283 of 480). Leaning or sitting seemed to aggravate his symptoms and heel and toe walking were slightly difficult (Docket No. 11, pp. 282, 283 of 480). Plaintiff's back showed some tenderness along the midline in the lumbosacral area (Docket No. 11, p. 283 of 480). He was partially able to complete a deep knee bend and return (Docket No. 11, p. 283 of 480). Plaintiff was diagnosed with a central disc herniation and aggravation of his pre-existing degenerative disc disease (Docket No. 11, p. 283 of 480).

---

[3] Also known as a Lasegue's sign. Present in several abnormal conditions [such] as a disorder in the lower vertebrae of the spine . . . and sciatica. ATTORNEYS' DICTIONARY OF MEDICINE, L-66118 (2009).

[4] A test which helps to distinguish arthritis of the hip joint from sciatica. With the patient lying on his back, the thigh and knee are flexed and that external malleolus (the knuckle on the outside of the ankle) is placed on or above the kneecap of the other leg. This procedure is generally accomplished without pain. The knee of the flexed leg is pressed down by the examiner, and if this causes pain, it is assumed that the condition involved is arthritis of the hip joint rather than sciatica. ATTORNEYS' DICTIONARY OF MEDICINE, P-88280 (2009).

Plaintiff's next visit came nearly a year later when he saw Dr. Joseph S. Krueger, MD ("Dr. Krueger") complaining of increasing back pain, especially, Plaintiff noted, after he attempted to lift a twenty-pound box in his garage (Docket No. 11, p. 330 of 480). Plaintiff had a somewhat slow gait and experienced pain with a straight leg raise to eighty degrees bilaterally (Docket No. 11, p. 330 of 480). He also had tenderness to palpation in the lower lumbar region along the paraspinal musculature (Docket No. 11, p. 330 of 480). Plaintiff was diagnosed with back pain and a probable recurring herniated disc (Docket No. 11, p. 330 of 480). He was prescribed Relafen and Darvocet (Docket No. 11, p. 330 of 480).

On March 27, 2006, Plaintiff saw Dr. Randall J. Bowman, MD ("Dr. Bowman"), his primary physician, complaining of lower back pain (Docket No. 11, p. 329 of 480). Plaintiff claimed his symptoms had only minimally improved since he saw Dr. Krueger (Docket No. 11, p. 329 of 480). Tension was noted throughout Plaintiff's lower back and his lumbar flexion was limited (Docket No. 11, p. 329 of 480). Plaintiff had a questionable positive straight-leg test (Docket No. 11, p. 329 of 480). Dr. Bowman recommended physical therapy, including aquatic therapy (Docket No. 11, p. 329 of 480). Plaintiff was limited to bending only twenty to forty-five degrees and was ordered to refrain from all climbing and overhead work until May 1, 2006 (Docket No. 11, p. 329 of 480).

Plaintiff's records then jump to June 9, 2007, when he underwent imaging on his spine and chest (Docket No. 11, pp. 348-50 of 480). Results were unremarkable for both sequences (Docket No. 11, pp. 348-50 of 480). On June 11, 2007, Plaintiff saw Dr. Bowman complaining of left arm numbness and a ringing in his right ear (Docket No. 11, p. 327 of 480). Plaintiff stated he reduced his tobacco use from one pack per day to four cigarettes per day (Docket No. 11, p. 327 of 480). Plaintiff was encouraged to stop smoking altogether (Docket No. 11, p. 327 of 480). The next day, June 12,

2007, Plaintiff underwent an arterial Doppler examination and ultrasound on his left arm and ankles (Docket No. 11, pp. 346, 347 of 480). The tests showed normal arterial pressures, indices, and waveform in both forearms and ankles (Docket No. 11, pp. 346, 347 of 480).

Plaintiff returned to Dr. Bowman on June 15, 2007, claiming he woke up feeling shaky, sweaty, and tense (Docket No. 11, p. 325 of 480). Plaintiff also stated his left arm remained numb (Docket No. 11, p. 325 of 480). Dr. Bowman noted Plaintiff had recently been on an antiobiotic for gum disease, which seemed to help his symptoms (Docket No. 11, p. 325 of 480). Plaintiff stated he had stopped smoking (Docket No. 11, p. 325 of 480). Dr. Bowman diagnosed Plaintiff with probable carpal tunnel syndrome and requested Plaintiff undergo a four-hour glucose tolerance test (Docket No. 11, p. 325 of 480).

On July 13, 2007, Plaintiff returned to Dr. Bowman complaining of shaking, sweating, and insomnia (Docket No. 11, p. 324 of 480). At that time, Dr. Bowman noted Plaintiff showed evidence of reactive hypoglycemia (Docket No. 11, p. 324 of 480). Dr. Bowman encouraged Plaintiff to eat small meals and avoid concentrated sweets (Docket No. 11, p. 324 of 480). Plaintiff saw Dr. Bowman again on September 18, 2007, still reporting shaking and sweating (Docket No. 11, p. 323 of 480). He demonstrated evidence of reactive hypoglycemia with a two-hour blood sugar of fifty-nine (Docket No. 11, p. 323 of 480). Plaintiff was instructed to eat every two hours and avoid consumption of concentrated sweets (Docket No. 11, p. 323 of 480).

On January 2, 2008, Plaintiff underwent an MRI of his spine (Docket No. 11, p. 344 of 480). The test revealed a moderate size posterior disc extrusion at the L5-S1 vertebrae, which was abutting and slightly displacing the intracanalicular left-sided nerve root, the likely culprit of Plaintiff's lower back pain (Docket No. 11, p. 344 of 480). There was also evidence of small posterior focal annulus

9

tears (Docket No. 11, p. 344 of 480).

Plaintiff saw Dr. Patrick McCormick, MD ("Dr. McCormick") on February 4, 2008, complaining of mechanical lower back pain and bilateral lower extremity radicular pain, which was more prounounced on his left side (Docket No. 11, p. 279 of 480). His symptoms increased with weight-bearing activity and Plaintiff rated his pain between four and nine out of a possible ten (Docket No. 11, p. 279 of 480). Plaintiff had a forward-leaning station and antalgic gait, but his balance was normal (Docket No. 11, p. 280 of 480). He had restricted range of motion in his hip and knee, but this was not associated with any discomfort (Docket No. 11, p. 280 of 480). Plaintiff also had limited range of motion in his lumbar spine, which was uncomfortable and tender (Docket No. 11, p. 280 of 480). Dr. McCormick discussed with Plaintiff the fact that his pain was suggestive of bilateral L5 radiculopathy, which likely stemmed from a foraminal compromise at the L5-S1 level (Docket No. 11, p. 280 of 480). Plaintiff elected to proceed with surgery (Docket No. 11, p. 280 of 480). Plaintiff's surgery was confirmed on June 30, 2008 (Docket No. 11, pp. 277-78 of 480).

On July 10, 2008, Plaintiff underwent back surgery with Dr. McCormick (Docket No. 11, pp. 252, 437 of 480). The surgery included a posterior lumbar interbody fusion at the L5-S1 vertebrae, a lumbar segmental fixation at the L5-S1 vertebrae, implantation of an intradiscal fusion device, and harvesting of morselized bone graft (Docket No. 11, pp. 252, 437 of 480). Immediately after surgery Plaintiff rated his pain at level five, but noted that when he moved, it increased to level eight or nine (Docket No. 11, pp. 251 of 480).

Plaintiff returned to Dr. McCormick on August 25, 2008 (Docket No. 11, pp. 275, 301 of 480). He claimed to be experiencing pain that radiated into his buttocks and groin with weight-bearing activity (Docket No. 11, pp. 275, 301 of 480). Dr. McCormick recommended Plaintiff follow through

10

with physical therapy and remain off work for twelve weeks (Docket No. 11, pp. 275, 301 of 480). On

November 17, 2008, Plaintiff reported to Dr. McCormick no improvement in his back and stated the

physical therapy was making things worse (Docket No. 11, pp. 273, 299 of 480). Plaintiff complained

of a tingling sensation in his feet, significant back pain, and a limited ability to bend, lift, stoop, and

rotate at the trunk (Docket No. 11, pp. 273, 299 of 480). Dr. Bowman suggested Plaintiff resume

physical therapy (Docket No. 11, pp. 273, 299 of 480). Views of Plaintiff's lumbar spine revealed no

acute bony abnormality (Docket No. 11, pp. 243, 295, 341 of 480).

On December 10, 2008, Plaintiff underwent an MRI of his lumbar spine (Docket No. 11, pp.

293, 339 of 480). This revealed small lateral disc bulges at the L3-L4 vertebrae, a small diffuse annular

disc bulge at the L4-L5 vertebrae without significant compromise of the foramina, and a recurrent

small broad-based posterior central disc protrusion (Docket No. 11, pp. 293, 339 of 480). Plaintiff was

diagnosed with minor multi-level disc bulges which did not compromise the canal or foramina at any

level (Docket No. 11, pp. 293, 339 of 480).

Plaintiff returned to Dr. McCormick on February 2, 2009 (Docket No. 11, pp. 272, 298 of 480).

Dr. McCormick noted Plaintiff was making satisfactory progress and had diminished pain and

improved functional capabilities (Docket No. 11, pp. 272, 298 of 480). Plaintiff also had normal

segmental strength and sensation (Docket No. 11, pp. 272, 298 of 480). On February 18, 2009,

Plaintiff saw Dr. Bowman, who prescribed Gabapentin and applied a Flector patch (Docket No. 11, p.

292 of 480).

During a follow-up appointment with Dr. Bowman on March 11, 2009, Dr. Bowman noted that

Dr. McCormick reported Plaintiff had reached maximum medical improvement (Docket No. 11, p. 291

of 480). Plaintiff presented with restricted flexibility in his lower extremities and had a positive

11

straight leg raise test bilaterally (Docket No. 11, p. 291 of 480). Plaintiff reported he never filled the prescription for Gabapentin because he was nervous about its side effects (Docket No. 11, p. 291 of 480). Dr. Bowman found Plaintiff to be at maximum medical improvement and encouraged him to try the Gabapentin (Docket No. 11, p. 291 of 480).

Plaintiff returned to Dr. Bowman on May 6, 2009, complaining of lower back pain (Docket No. 11, p. 290 of 480). Plaintiff was taking Neurontin and using a Flector patch, which he reported provided a "modicum of relief" (Docket No. 11, p. 290 of 480). Plaintiff had pain with the extension of his back to an upright position, flexion, and lateral extension (Docket No. 11, p. 290 of 480). He also suffered from an antalgic gait and markedly limited lumbar flexibility and pain across his back upon palpation (Docket No. 11, p. 290 of 480). Dr. Bowman recommended Plaintiff continue use of the Flector patch (Docket No. 11, p. 290 of 480).

On December 7, 2009, Plaintiff reported to the Fulton County Health Center Rehabilitation Department ("Fulton County Rehab") complaining of difficulty walking and completing activities of daily living (Docket No. 11, p. 380 of 480). Plaintiff rated his pain between six and nine out of a possible ten (Docket No. 11, p. 380 of 480). He indicated he had difficulty going up and down the stairs and putting on his socks and shoes (Docket No. 11, p. 380 of 480). Plaintiff also complained of numbness and tingling in both feet, accompanied by a burning sensation (Docket No. 11, p. 380 of 480). Lower trunk rotation increased his pain (Docket No. 11, p. 380 of 480). Plaintiff demonstrated a positive straight leg raise test bilaterally at forty-five degrees (Docket No. 11, p. 380 of 480). He ambulated with an antalgic gait on his left leg, demonstrating a decreased right step length (Docket No. 11, p. 380 of 480). Plaintiff also had pain throughout his lumbar region and bilateral hips, sensitive even to light touch (Docket No. 11, p. 380 of 480). Physical therapist Sarrah B. Zeiter ("Ms. Zeiter")

12

reported Plaintiff's rehabilitation potential was good and recommended he undergo therapy three times per week for three weeks (Docket No. 11, pp. 378, 380, 381 of 480).

Plaintiff reported to the Fulton County Health Center Emergency Room ("Fulton County ER") on July 12, 2010, complaining of lower back pain after having twisted it (Docket No. 11, p. 374 of 480). Plaintiff described the pain as "stabbing" and rated it as an eight out of a possible ten (Docket No. 11, p. 374 of 480). Plaintiff had tenderness over his lumbar spine, but reported no numbness or weakness in his legs (Docket No. 11, p. 374 of 480). Plaintiff also reported smoking one pack of cigarettes per day (Docket No. 11, p. 374 of 480). Plaintiff was given Vicodin and a Toradol injection and was discharged (Docket No. 11, p. 374 of 480).

Plaintiff returned to the Fulton County ER on July 29, 2010, complaining of an exacerbation of his chronic lower back pain (Docket No. 11, pp. 372, 467 of 480). Plaintiff stated his pain was in his lower back with radiation to the posterior mid-thigh (Docket No. 11, pp. 372, 467 of 480). Plaintiff also complained of muscle spasms in the lumbar area (Docket No. 11, pp. 372, 467 of 480). He had considerable pain upon palpation to his sacroiliac bilaterally (Docket No. 11, pp. 372, 467 of 480). Plaintiff was diagnosed with an acute exacerbation of his chronic lower back pain and given Vicodin and a Toradol injection (Docket No. 11, pp. 372, 467 of 480).

On August 2, 2010, Plaintiff saw Dr. Bowman and complained of lower back pain and spasms, which prevented him from getting comfortable (Docket No. 11, p. 465 of 480). Plaintiff had an antalgic gait and had difficulty with both toe and heel walking (Docket No. 11, p. 465 of 480). He had extensive tenderness with palpation in his lower thoracic and lumbar regions (Docket No. 11, p. 465 of 480). Plaintiff was prescribed Vicodin (Docket No. 11, p. 466 of 480). On August 13, 2010, Plaintiff underwent an MRI of his lumbar spine (Docket No. 11, pp. 370, 464 of 480). The test revealed chronic

13

degenerative changes at the L5-S1 vertebrae accompanied by a small, broad-based posterior disc protrusion, old laminectomy, and old posterior fusion (Docket No. 11, pp. 370, 464 of 480). The MRI showed no significant compromise of the canal or foramina, and essentially no change from Plaintiff's December 2008 MRI (Docket No. 11, pp. 370, 464 of 480).

Plaintiff returned to Dr. Bowman on August 18, 2010 (Docket No. 11, p. 463 of 480). Plaintiff reported taking numerous medications, including Arthrotec, Crestor, Gabapentin, Viagra, and Vicodin (Docket No. 11, p. 463 of 480). At that time, Dr. Bowman noted Plaintiff was not a surgical candidate and suggested Plaintiff try acupuncture (Docket No. 11, p. 463 of 480). Plaintiff met with Dr. Larry Kennedy, MD ("Dr. Kennedy") on August 25, 2010, for an acupuncture trial (Docket No. 11, p. 461 of 480). Plaintiff was tender in his lumbosacral paraspinals and gluteal region and directly over his coccyx (Docket No. 11, p. 461 of 480). His range of motion was reduced by at least fifty percent and a straight leg test caused some increased back pain bilaterally, but no radiating pain (Docket No. 11, p. 462 of 480). Plaintiff indicated he had been on Vicodin for the past six weeks, but had not been on any narcotics prior to this period (Docket No. 11, p. 461 of 480). Plaintiff elected to proceed with acupuncture (Docket No. 11, p. 462 of 480). He underwent a series of eight treatments from September 29, 2010, through December 15, 2010 (Docket No. 11, pp. 452-58 of 480). Plaintiff received no relief (Docket No. 11, pp. 452-58 of 480).

Plaintiff returned to Dr. Bowman on January 4, 2011, complaining of back pain and depression (Docket No. 11, p. 450 of 480). He refused psychological treatment (Docket No. 11, p. 450 of 480). At that time, Plaintiff was on a regimen of Acetaminophen, Crestor, Gabapentin, Viagra, and Vicodin (Docket No. 11, p. 450 of 480).

C.    **EVALUATIONS**

1.     **PHYSICAL RESIDUAL FUNCTIONAL CAPACITY ASSESSMENTS**

On January 20, 2009, Plaintiff underwent a Physical Residual Functional Capacity Assessment with occupational therapist Beth Gericke ("Ms. Gericke") and physical therapist Jessye Hartman ("Ms. Hartman") at the Fulton County Rehab Center (Docket No. 11, pp. 264-70 of 480). Plaintiff reported taking no prescription medication and complained of the following symptoms: (1) stabbing pain down his entire left leg; (2) groin pain; (3) occasional muscle spasms above his back brace; (4) pain at his surgery incision site; and (5) pain in both feet (Docket No. 11, p. 265 of 480). Plaintiff complained of significant nocturnal pain which prevented him from sleeping through the night (Docket No. 11, p. 266 of 480). He was unable to lean forward without pain (Docket No. 11, p. 266 of 480). Upon examination, Plaintiff complained of pain at a twenty-five-degree lumbar flexion (Docket No. 11, p. 266 of 480). Side bending was restricted bilaterally and his bilateral lower extremity range of motion was grossly within functional limits (Docket No. 11, p. 266 of 480). Plaintiff tested positive bilaterally with a Slump test, and had a positive bilateral straight-leg raise at thirty degrees (Docket No. 11, p. 266 of 480). He was tender to palpation around his lumbar sacral region (Docket No. 11, p. 266 of 480). Plaintiff could sit for twenty-minutes, stand for thirty-nine minutes, and was able to kneel for one minute (Docket No. 11, p. 268 of 480). Plaintiff was unable to walk on a treadmill at one-half mile per hour, had difficulty squatting, and declined to bend at his trunk, crawl, or stoop (Docket No. 11, p. 268 of 480). The therapists recommended Plaintiff engage only in sedentary work (Docket No. 11, p. 270 of 480).

Six months later, on June 16, 2009, Plaintiff underwent a second Physical Residual Functional Capacity Assessment with state examiner Dr. Elizabeth Das, MD ("Dr. Das") (Docket No. 11, pp. 304-11 of 480). Dr. Das concluded Plaintiff could: (1) occasionally lift and/or carry twenty pounds; (2)

15

frequently lift and/or carry ten pounds; (3) stand and/or walk for six hours during an eight-hour workday; (4) sit for six hours during an eight-hour workday; and (5) engage in unlimited pushing and pulling (Docket No. 11, p. 305 of 480). Plaintiff could occasionally climb ramps and stairs, balance, stoop, and crouch, but could never climb ladders, ropes, or scaffolds (Docket No. 11, p. 306 of 480). Plaintiff had no manipulative, visual, communicative, or environmental limitations (Docket No. 11, pp. 307-08 of 480).

On February 10, 2011, Dr. Bowman completed a Residual Functional Capacity Assessment (Docket No. 11, pp. 471-75 of 480). Dr. Bowman concluded Plaintiff suffered from chronic degenerative disc disease and opined that Plaintiff could sit for eight hours, stand for four hours, and walk for two hours during an eight-hour workday (Docket No. 11, p. 472 of 480). Plaintiff also required a sit/stand option (Docket No. 11, p. 472 of 480). Dr. Bowman found Plaintiff could lift and/or carry up to ten pounds frequently and up to twenty pounds occasionally (Docket No. 11, p. 473 of 480). Plaintiff could not use his feet for repetitive movement (Docket No. 11, p. 474 of 480). Plaintiff could occasionally bend, but never squat, crawl, or climb (Docket No. 11, p. 474 of 480). Dr. Bowman noted Plaintiff had moderate limitations with regard to most environmental hazards, including moving machinery, driving automotive equipment, and exposure to temperature extremes, dust, fumes, and gasses (Docket No. 11, p. 475 of 480).

### 2. PSYCHOLOGICAL EVALUATIONS

#### a. MARCH 9, 2010

On March 9, 2010, Plaintiff underwent a psychological evaluation with Dr. Daniel J. Kuna, Ph.D ("Dr. Kuna") (Docket No. 11, pp. 391-93 of 480). Although cooperative with the evaluation, Plaintiff presented with a blunt affect and significant pain behavior (Docket No. 11, p. 392 of 480). He

16

reported taking Neurontin three times per day and smoking one pack of cigarettes per day (Docket No. 11, p. 392 of 480). Plaintiff noted an increased sense of irritability and anger towards others, something he felt guilty about (Docket No. 11, p. 392 of 480). He suffered from a lack of motivation, given his pain (Docket No. 11, p. 392 of 480). Plaintiff reported a fluctuating appetite, crying spells, concentration difficulties, increased apathy, lack of sexual interest, and social withdrawal (Docket No. 11, p. 392 of 480). Dr. Kuna diagnosed Plaintiff with Major Depressive Disorder ("MDD"), single episode, moderate, which he attributed to Plaintiff's industrial accident and failed surgery (Docket No. 11, p. 393 of 480).

### b.     APRIL 30, 2010

Plaintiff participated in a second psychological evaluation, at the request of the Bureau of Worker's Compensation ("BWC"), with Dr. Christopher Layne, Ph.D ("Dr. Layne") on April 30, 2010 (Docket No. 11, pp. 422-29 of 480). At that time, Plaintiff complained of physical pain, depression, forgetfulness, and money and sex problems (Docket No. 11, p. 426 of 480). Upon examination, Dr. Layne found no evidence of Plaintiff's professed depression (Docket No. 11, p. 426 of 480). Plaintiff was dressed appropriately and maneuvered absent any pain behavior (Docket No. 11, p. 436 of 480). Dr. Layne noted Plaintiff did not display the expected "over-compliance" behavior; rather, Plaintiff was uncooperative (Docket No. 11, p. 426 of 480). Plaintiff failed to answer questions about his life before his accident and did not follow test instructions (Docket No. 11, p. 436 of 480). Plaintiff also refused to discuss his injury in any detail, choosing instead to leave and, according to Dr. Layne, "got up quickly and walked out fast - again, with no hints of pain, much less disabling pain" (Docket No. 11, p. 436 of 480).

Plaintiff displayed no signs of mood problems, including mood swings, crying, or pessimism

(Docket No. 11, p. 426 of 480). He was "never anxious, had steady hands, an irritable, blunt voice, and . . . no sweating or gasping" (Docket No. 11, p. 426 of 480). Dr. Layne assessed Plaintiff's intelligence as average and his orientation as adequate (Docket No. 11, p. 426 of 480). He displayed no preoccupations, intrusive memories, or psychosis (Docket No. 11, p. 426 of 480).

Dr. Layne opined that Plaintiff did not suffer from depression or any mental disability (Docket No. 11, p. 428 of 480). According to Dr. Layne, Plaintiff "had not stayed home; he traveled with his girlfriend and saw other friends. He worked on old cars. He never took antidepressants . . . He shunned vocational rehabilitation, not because of depression, but because it threatened the disability money . . . he showed inflated self-confidence, energy, assertiveness, anger, and lack of cooperation" (Docket No. 11, p. 427 of 480). Further, Plaintiff had no cognitive problems, was able to understand and follow instructions, could sustain concentration, and suffered no emotional problems (Docket No. 11, p. 438 of 480). Dr. Layne reported Plaintiff could return to his prior employment and could emotionally "endure a demanding work schedule and tolerate demanding bosses and irritated customers" (Docket No. 11, p. 428 of 480). Dr. Layne assigned Plaintiff a Global Assessment of Functioning ("GAF")[5] score of eighty-one (Docket No. 11, p. 427 of 480).

### c.   JUNE 9, 2010

On June 9, 2010, Plaintiff underwent a psychological evaluation with Dr. Lee Howard, Ph.D ("Dr. Howard") (Docket No. 11, pp. 400-17 of 480). Plaintiff was on time for the evaluation and

---

[5] The Global Assessment of Functioning Scale is a 100-point scale that measures a patient's overall level of psychological, social, and occupational functioning on a hypothetical continuum. A score of eighty-one indicates absent or minimal symptoms, good functioning in all areas, interested and involved in a wide range of activities, socially effective, generally satisfied with life, no more than everyday problems or concerns. THE DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (hereinafter DSM-IV) 34 (Am. Psychiatric Ass'n) (4th ed. 1994).

dressed appropriately (Docket No. 11, p. 410 of 480). His behavior and social presentation were normal/average (Docket No. 11, p. 410 of 480). Plaintiff reported feeling depressed twice a week for six hours, especially during the times his son was with his ex-wife (Docket No. 11, p. 406 of 480). Dr. Howard noted Plaintiff's mood and affect were generally within the normal range with no classic symptoms of depression (Docket No. 11, p. 410 of 480). Plaintiff reported crying spells two to three times per week, and recent suicidal ideation (Docket No. 11, p. 411 of 480).

Based on his evaluation, Dr. Howard found Plaintiff to be cognitively oriented with flowing, relevant, goal-directed, and coherent thoughts (Docket No. 11, p. 411 of 480). He had no auditory or visual hallucinations, paranoid ideation, or psychosis (Docket No. 11, p. 411 of 480). Plaintiff had good immediate memory but reduced long-term memory (Docket No. 11, p. 412 of 480). Plaintiff's concentration was variable (Docket No. 11, p. 412 of 480). Based on personality testing, Plaintiff displayed an "unusually high elevation" on the fake bad scale, which Dr. Howard noted was typical of individuals involved in litigation or who are seeking compensation (Docket No. 11, p. 412 of 480). Dr. Howard also administered a Minnesota Multiphasic Personality Inventory[6] ("MMPI"), for which Plaintiff achieved an unusually elevated score (Docket No. 412 of 480). According to Dr. Howard, this result is indicative of "high levels of symptom magnification and/or exaggeration" (Docket No. 11, p. 412 of 480). Plaintiff's scores were "suspicious" for a malingering tendency (Docket No. 11, p. 413 of 480).

Dr. Howard concluded Plaintiff did not display any classic symptoms of depression and did not suffer from MDD (Docket No. 11, pp. 414, 416 of 480). Plaintiff's self-report represented a

---

[6] A questionnaire type of personality test in which the subject answers yes or no to questions covering physical health, sexual, religious, political, and social attributes, family and marital problems, etc., for a total of 550 items. The results are compared to the answers given by criterion groups. ATTORNEYS' DICTIONARY OF MEDICINE, M-75435 (2009).

"significant overpatholigizing of [his] current clinical state" (Docket No. 11, p. 414 of 480). Dr. Howard assigned Plaintiff a GAF score of seventy[7] (Docket No. 11, p. 415 of 480).

### d.    AUGUST 2, 2010

On August 2, 2010, Dr. Kuna reviewed the reports of both Drs. Layne and Howard (Docket No. 11, pp. 386-89 of 480). Dr. Kuna reported that, during Plaintiff's first psychological evaluation, there was no evidence of over-reporting, exaggeration, or malingering (Docket No. 11, p. 388 of 480). Plaintiff also returned for a follow-up interview on July 22, 2010 (Docket No. 11, p. 387 of 480). Plaintiff presented with continuing suicidal ideation and daily crying spells (Docket No. 11, pp. 387-88 of 480). Dr. Kuna reaffirmed his diagnosis of MDD (Docket No. 11, p. 389 of 480).

### e.    SEPTEMBER 14, 2010

On September 14, 2010, Plaintiff underwent a Supplemental Functional Assessment at the request of the BWC (Docket No. 11, pp. 384-85 of 480). The examiner found Plaintiff suffered from untreated depression (Docket No. 11, p. 384 of 480). Plaintiff was severely limited in his ability to maintain his safety and the safety of others and moderately-severely limited in his ability to maintain control of his emotions (Docket No. 11, p. 385 of 480). He had moderate limitations in his ability to: (1) handle goals, objectives, and performance measures; (2) comprehend and follow instructions; (3) maintain an appropriate work pace; (4) respond appropriately to supervision; (5) generalize, evaluate, and make independent decisions without immediate supervision; (6) interact with customers; (7) accept and carry out responsibility for direction, control, and planning of tasks; (8) perform intellectually complex tasks; and (9) supervise or manage others (Docket No. 11, p. 385 of 480).

_____

[7] A score of seventy indicates some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well, has some meaningful interpersonal relationships. DSM-IV at 34.

20

Plaintiff had mild limitations with regard to his ability to: (1) perform activities of daily living; (2) perform simple and repetitive tasks; and (3) perform work where contact with others is minimal (Docket No. 11, p. 385 of 480).

### IV. STANDARD OF DISABILITY

The Commissioner's regulations governing the evaluation of disability for DIB and SSI are identical for purposes of this case, and are found at 20 C.F.R. §§ 404.1520 and 416.920. *Colvin v. Barnhart,* 475 F.3d 727, 730 (6th Cir. 2007). DIB and SSI are available only for those who have a "disability." 42 U.S.C. § 423(a), (d); *see also* 20 C.F.R. § 416.920. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Colvin*, 475 F.3d at 730 (*citing* 42 U.S.C. § 423(d)(1)(A)) (definition used in the DIB context); *see also* 20 C.F.R. § 416.905(a) (same definition used in the SSI context).

The Commissioner uses a five-step sequential evaluation process to evaluate a DIB or SSI claim. First, a claimant must demonstrate he is not engaged in "substantial gainful activity" at the time he seeks disability benefits. *Colvin*, 475 F.3d at 730 (*citing Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990)). Second, a claimant must show he suffers from a "severe impairment." *Colvin*, 475 F.3d at 730. A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities." *Id.* (*citing Abbott,* 905 F. 2d at 923). At the third step, a claimant is presumed to be disabled regardless of age, education, or work experience if he is not engaged in substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets the requirements of a "listed" impairment. *Colvin*, 475 F.3d at 730.

21

Prior to considering step four, the Commissioner must determine a claimant's residual functional capacity. 20 C.F.R. §§ 404.1520(e), 416.920(e). An individual's residual functional capacity is an administrative "assessment of [the claimant's] physical and mental work abilities – what the individual can or cannot do despite his or her limitations." *Converse v. Astrue*, 2009 U.S. Dist. LEXIS 126214, *16 (S.D. Ohio 2009); *see also* 20 C.F.R. § 404.1545(a). It "is the individual's *maximum* remaining ability to do sustained work activities in an ordinary work setting on a **regular and continuing** basis . . . A regular and continuing basis means 8 hours a day, for 5 days a week, or an equivalent work schedule." *Converse*, 2009 U.S. Dist. LEXIS 126214 at *17 (*quoting SSR* 96-8p, 1996 SSR LEXIS 5 (July 2, 1996) (emphasis in original) (internal citations omitted)).The Commissioner must next determine whether the claimant has the residual functional capacity to perform the requirements of his past relevant work. 20 C.F.R. §§ 404.1520(f), 416.920(f). If he does, the claimant is not disabled.

Finally, even if the claimant's impairment does prevent him from doing past relevant work, the claimant will not be considered disabled if other work exists in the national economy that he can perform. *Colvin*, 475 F.3d at 730 (*citing Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001) (internal citations omitted) (second alteration in original)). A dispositive finding by the Commissioner at any point in the five-step process terminates the review. *Colvin*, 475 F.3d at 730 (*citing* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4)).

## V. THE COMMISSIONER'S FINDINGS

After careful consideration of the disability standards and the entire record, ALJ Belford made the following findings:

1. Plaintiff meets the insured status requirements of the Social Security Act through December 31, 2013.

2. Plaintiff has not engaged in substantial gainful activity since July 9, 2008, the alleged onset date.

3. Plaintiff has the following severe impairments: disc herniation at L5-S1, status post spinal fusion, obesity, and major depressive disorder.

6. Plaintiff does not have an impairment or combination of impairments that meets or medically equals any of the impairments listed in 20 CFR Part 404, Subpart P, Appendix 1.

7. Plaintiff has the residual functional capacity to perform light work with some exceptions: (1) lift, carry, push, or pull twenty pounds occasionally and ten pounds frequently; (2) stand for four hours during an eight-hour workday; (3) walk for two hours during an eight-hour workday; (4) sit for six hours during an eight-hour workday; (5) requires a sit/stand option; (6) only occasional climbing ramps or stairs, stooping, crouching, kneeling, and crawling; (7) occasional overhead reaching of not more than five pounds; and (8) simple routine work with only occasional interaction with the public.

8. Plaintiff is unable to perform past relevant work.

9. Plaintiff was born on October 1, 1969, and was 38 years old, which is defined as a younger individual, on the alleged disability onset date.

10. Plaintiff has a limited education and is able to communicate in English.

11. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that Plaintiff is "not disabled," whether or not Plaintiff has transferable job skills.

12. Considering Plaintiff's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that Plaintiff can perform.

13. Plaintiff has not been under a disability, as defined in the Social Security Act, from July 9, 2008, through the date of this decision.

(Docket No. 11, pp. 56-67 of 480). ALJ Belford denied Plaintiff's request for DIB and SSI benefits

(Docket No. 11, p. 67 of 480).

## VI. STANDARD OF REVIEW

This Court exercises jurisdiction over the final decision of the Commissioner pursuant to 42

U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3).  *McClanahan v. Comm'r of Soc. Sec.,* 474 F.3d 830, 832-33 (6th Cir. 2006).  In conducting judicial review, this Court must affirm the Commissioner's conclusions unless the Commissioner failed to apply the correct legal standard or made findings of fact that are unsupported by substantial evidence.  *Id.* (*citing Branham v. Gardner*, 383 F.2d 614, 626-27 (6th Cir. 1967)).  "The findings of the [Commissioner] as to any fact if supported by substantial evidence shall be conclusive . . ." *McClanahan*, 474 F.3d at 833 (*citing* 42 U.S.C. § 405(g)).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *McClanahan*, 474 F.3d at 833 (*citing Besaw v. Sec'y of Health and Human Servs*., 966 F.2d 1028, 1030 (6th Cir. 1992)).  "The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion . . . This is so because there is a 'zone of choice' within which the Commissioner can act, without the fear of court interference." *McClanahan*, 474 F.3d at 833 (*citing Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001) (citations omitted)).

## VII. DISCUSSION

### A. PLAINTIFF'S ALLEGATIONS

Plaintiff makes a number of allegations in his brief on the merits, which can be summarized as follows:

> 1. The ALJ erred when he failed to address Plaintiff's medications, and their sides effects, both in his hypothetical question to the VE and in his final decision.
>
> 2. The ALJ failed to abide by the treating physician rule, assigning the opinion of Plaintiff's treating physician, Dr. Bowman, "great" rather than "controlling" weight without providing further explanation.

24

3.      The ALJ erred by failing to specify the frequency of Plaintiff's sit/stand option.

4.      The ALJ failed to properly limit Plaintiff to sedentary work, given his inability to lift weight overhead.

5.      The ALJ failed to assign proper credibility to Plaintiff's subjective statements.

6.      The ALJ failed to properly consider Plaintiff's obesity.

7.      The ALJ posed an inaccurate hypothetical question to the VE.

8.      The ALJ erred by accepting the VE's employment numbers, given the VE's failure to account for her methodology.

(Docket No. 15).

## B.      DEFENDANT'S RESPONSE

Defendant disagrees with Plaintiff's assignments of error, arguing that the ALJ based his opinion on substantial evidence contained in the record (Docket No. 16).

## C.      DISCUSSION

### 1.      PLAINTIFF'S MEDICATIONS

Plaintiff first alleges the ALJ failed to address Plaintiff's numerous medications and their side effects (Docket No. 15, pp. 15-16 of 27). Defendant disagrees, arguing that the issue is not whether the medications *cause* side effects, but whether those side effects limit Plaintiff's ability (Docket No. 16, p. 17 of 31). Although Plaintiff cites to 20 C.F.R. §§ 404.1529(c) and 416.929(c), which deal with credibility, the effect of medications is more salient to the issue of a claimant's residual functional capacity.

To properly determine a claimant's ability to work and the corresponding level at which that work may be performed, the ALJ must determine the claimant's residual functional capacity. *Webb v.*

25

*Comm'r of Soc. Sec.*, 368 F.3d 629, 633 (6th Cir. 2004). According to Social Security Regulations, residual functional capacity is designed to describe the claimant's physical and mental work abilities. *Id*. Residual functional capacity is an administrative "assessment of [the claimant's] physical and mental work abilities – what the individual can or cannot do despite his or her limitations." *Converse v. Astrue*, 2009 U.S. Dist. LEXIS 126214, *16 (S.D. Ohio 2009); *see also* 20 C.F.R. § 404.1545(a). Residual functional capacity "is the individual's *maximum* remaining ability to do sustained work activities in an ordinary work setting on a **regular and continuing** basis . . . A regular and continuing basis means 8 hours a day, for 5 days a week, or an equivalent work schedule." *Converse*, 2009 U.S. Dist. LEXIS 126214 at *17 (*quoting SSR* 96-8p, 1996 SSR LEXIS 5 (July 2, 1996) (emphasis in original) (internal citations omitted)).

To determine a claimant's residual functional capacity, the Commissioner will make an assessment based on all relevant medical and other evidence. 20 C.F.R. § 20.1545(a)(3). Before making a final determination a claimant is not disabled, the Commissioner bears the responsibility of developing the claimant's complete medical history. 20 C.F.R. § 20.1545(a)(3). The Commissioner "will consider any statements about what [a claimant] can still do that have been provided by medical sources, whether or not they are based on formal medical examinations. [The Commissioner] will also consider descriptions and observations of [a claimant's] limitations from [his] impairment(s), including limitations that result from [his] symptoms, such as pain, provided by [claimant], [his] family, neighbors, friends, or other persons." 20 C.F.R. § 20.1545(a)(3). Responsibility for deciding residual functional capacity rests with the ALJ when cases are decided at an administrative hearing. *Webb*, 368 F.3d at 633.

As of January 4, 2011, Plaintiff was on a prescription regimen consisting of

26

Acetaminophen/Hydrocodone, Crestor, Gabapentin, Viagra, and Vicodin (Docket No. 11, p. 450 of 480). Plaintiff testified the Vicodin made him tired, drowsy, forgetful, and dizzy (Docket No. 11, p. 31 of 480). Although such side effects *could* have an impact on Plaintiff's residual functional capacity, an ALJ is obligated to make such a determination based on the record as a whole. 20 C.F.R. § 20.1545(a)(3). Here, there is no evidence anywhere else in the record of Plaintiff's purported side effects. Plaintiff was first prescribed Vicodin in July 2010 (Docket No. 11, p. 374 of 480). The record contains at least eight subsequent medical records, none of which mention Plaintiff's Vicodin side effects (Docket No. 11, pp. 370, 374, 450, 452-58, 459, 461-62, 463, 464, 466 of 480). Furthermore, although Plaintiff testified he requires a nap after taking the Vicodin, Plaintiff is only supposed to take the Vicodin twice a day, once in the morning and once at night (Docket No. 11, p. 450 of 480). Therefore, contrary to what Plaintiff argues, he would not need to take multiple naps throughout the workday as a result of his Vicodin use (Docket No. 15, p. 16 of 27). Because there is no objective evidence as to the effects of Plaintiff's Vicodin use, the ALJ was correct to exclude it as a functional limitation. Plaintiff's first assignment of error is without merit.

## 2. TREATING PHYSICIAN RULE

The Sixth Circuit provided a detailed summary of the treating physician rule in *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399 (6th Cir. 2009). According to the Court, the treating physician rule:

> requires the ALJ to generally give greater deference to the opinions of treating physicians than to the opinions of non-treating physicians because these sources are likely to be the medical professional most able to provide a detailed, longitudinal picture of the claimant's medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (*quoting* 20 C.F.R. § 404.1527(d)(2)).

The ALJ must give a treating source opinion controlling weight if the treating source

opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record. *Wilson*, 378 F.3d at 544. On the other hand . . . it is an error to give an opinion controlling weight simply because it is the opinion of a treating source if it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if it is inconsistent . . . with other substantial evidence in the case record. *SSR* 96-2p, 1996 SSR LEXIS 9 at *5 (July 2, 1996). If the ALJ does not accord controlling weight to a treating physician, the ALJ must still determine how much weight is appropriate by considering a number of factors, including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician. *Wilson*, 378 F.3d at 544.

[T]he regulations require the ALJ to always give good reasons in the notice of determination or decision for the weight given to the claimant's treating source's opinion. 20 C.F.R. § 404.1527(d)(2). Those good reasons must be supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight. *SSR* 96-2p, 1996 SSR LEXIS 9 at *12.

*Blakley*, 581 F.3d at 406-07 (internal quotations omitted). Here, ALJ Belford assigned the opinion of Plaintiff's treating physician, Dr. Bowman, great weight (Docket No. 11, p. 63 of 480). Although the ALJ engaged in robust discussion about Dr. Bowman's opinion, Plaintiff is correct in stating ALJ Belford did not provide the necessary reasoning for not assigning the opinion controlling weight (Docket No. 15, pp. 17-18 of 27). Defendant would have this Court believe that such failure is simply harmless error, given the marginal differences between Dr. Bowman's opinion and the ALJ's residual functional capacity assessment (Docket No. 16, pp. 18-21 of 31). This Magistrate agrees.

In *Wilson*, the Sixth Circuit discussed the possibility that "if the Commissioner adopts the opinion of the treating source and makes findings consistent with the opinion, it may be irrelevant that the ALJ did not give weight to the treating physician's opinion, and the failure to give reasons for not giving such weight is correspondingly irrelevant." 378 F.3d at 547. Both ALJ Belford and Dr. Bowman reached the following conclusions concerning Plaintiff's residual functional capacity: (1)

28

Plaintiff can lift/carry, push/pull ten pounds frequently and twenty pounds occasionally; (2) Plaintiff can stand for four hours; (3) Plaintiff can walk for two hours; and (4) Plaintiff requires a sit/stand option (Docket No. 11, pp. 60, 471-75 of 480). ALJ Belford found Plaintiff could sit for six hours during an eight-hour workday, whereas Dr. Bowman opined Plaintiff could sit for a full eight hours (Docket No. 11, pp. 60, 472 of 480). The ALJ also found Plaintiff was limited to only occasional overhead reaching of no more than five pounds (Docket No. 11, p. 60 of 480). Dr. Bowman did not assign Plaintiff any overhead reaching limitations (Docket No. 11, p. 474 of 480). Dr. Bowman found Plaintiff could never squat, crawl or climb, whereas the ALJ limited Plaintiff to occasional stooping, crouching, kneeling, and crawling (Docket No. 11, pp. 11, 474 of 480). Dr. Bowman also included environmental limitations whereas ALJ Belford did not (Docket No. 11, pp. 60, 475 of 480). The ALJ limited Plaintiff to simple, routine work with only occasional interaction with the general public (Docket No. 11, p. 60 of 480).

The differences between the opinions are minor at best and, in fact, ALJ Belford's limitations, on the whole, are more restrictive than those issued by Dr. Bowman, with the exception of the environmental limitations. Courts "are not required to convert judicial review of agency action into a ping-pong game where remand would be an idle and useless formality." *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) (*citing NLRB v. Wyman-Gordon Co.*, 394 U.S. 759, 766 n. 6 (1969)). Even though ALJ Belford may have failed to thoroughly articulate his reasons for assigning Dr. Bowman's opinion only great weight, his own assessment of Plaintiff's residual functional capacity adopts a majority of, and adds to, Dr. Bowman's assessment. The Magistrate find that any error committed by the ALJ in his decision is harmless. Therefore, Plaintiff's assignment of error is without merit and the Magistrate recommends the decision of the Commissioner be affirmed.

### 3. SIT/STAND OPTION

Plaintiff next alleges the ALJ erred by failing to include the specific frequency required for Plaintiff's sit/stand option (Docket No. 15, p. 17 of 27). Defendant asserts that a plain reading of the ALJ's decision shows he intended the sit/stand option to be exercised at will (Docket No. 16, p. 21 of 31). This Magistrate agrees.

Although ALJ Belford could have included a specific number of times or frequency during an eight-hour workday that Plaintiff would need to exercise the sit/stand option, he chose not to do so. As Plaintiff points out in his brief, the ALJ is not a doctor nor does he suffer with Plaintiff's impairments (Docket No. 15, p. 18 of 27). It is impossible to determine from the record exactly how often Plaintiff would need to sit or stand during the course of an average workday. Even Dr. Bowman simply indicated that Plaintiff would require a sit/stand option (Docket No. 11, p. 472 of 480). Furthermore, the VE testified that a sit/stand option would not affect Plaintiff's ability to engage in other work (Docket No. 11, p. 43 of 480). No further detail is necessary, as no further detail can legitimately be given based on the record. Plaintiff's assignment of error is without merit and the Magistrate recommends the opinion of the Commissioner be affirmed.

### 4. OVERHEAD REACHING

Plaintiff next alleges the ALJ erred by not limiting Plaintiff to sedentary work, despite his overhead reaching restrictions (Docket No. 15, pp. 17-18 of 27). Plaintiff seems to equate reaching overhead with reaching in general (Docket No. 15, pp. 17-18 of 27). This is an incorrect assessment. Light work involves "lifting no more than [twenty] pounds at a time with frequent lifting or carrying of objects weighing up to [ten] pounds." 20 C.F.R. §§ 404.1567(b), 416.976(b). The regulation does not specifically mention an individual's ability to reach overhead. Furthermore, ALJ Belford included this

30

limitation in his hypothetical question to the VE (Docket No. 11, p. 42 of 480). The VE testified Plaintiff would be able to do all provided "other work," even with this limitation (Docket No. 11, pp. 42-44 of 480). Plaintiff's assignment of error is without merit and the Magistrate recommends the opinion of the Commissioner be affirmed.

### 5.    PLAINTIFF'S CREDIBILITY

Plaintiff also attempts to negate ALJ Belford's residual functional capacity assessment by arguing that the ALJ improperly conflated "activities of daily living" with "substantial gainful activity" (Docket No. 15, pp. 19-20 of 27). This is incorrect. The ALJ used Plaintiff's activities of daily living to properly evaluate Plaintiff's subjective complaints and resulting limitations. Under Social Security regulations, a claimant's subjective complaints of pain or other symptoms are not, on their own, conclusive evidence of a disability. 42 U.S.C. § 423(d)(5)(A). However, a claimant may experience pain severe enough to restrict his ability to work. In such cases, an ALJ must evaluate the credibility of a claimant's allegations. Social Security Ruling 96-7p provides the framework under which an ALJ must analyze a claimant's credibility. The Ruling states, in part:

> In determining the credibility of a claimant's statements, the adjudicator must consider the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record. An individual's statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded solely because they are not substantiated by objective medical evidence.

> It is not sufficient for the adjudicator to make a single, conclusory statement that the individual's allegations have been considered or that the allegations are (or are not) credible. It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms. The determination must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons

for that weight.

1996 SSR LEXIS 4, *2-4 (July 2, 1996). The ALJ's findings as to a claimant's credibility are entitled to deference. *Cross v. Comm'r of Soc. Sec.*, 373 F.Supp.2d 724, 736 (N.D. Ohio, 2005).

Here, ALJ Belford found Plaintiff's statements concerning the intensity, persistence, and limiting effects of his impairments to be inconsistent with the ALJ's assessment of light work (Docket No. 11, p. 61 of 480). The ALJ based this opinion upon his consideration of the record as a whole, which included Plaintiff's testimony about his activities of daily living. Specifically, ALJ Belford found numerous inconsistencies in the record, including: (1) Plaintiff's agreement with Dr. Bowman about his residual functional capacity; (2) Plaintiff's ability to care for his children and pets, drive, complete a wide range of household chores, and perform occasional yard work; and (3) Plaintiff's ability to have a normal relationship with his son (Docket No. 11, p. 61 of 480). Although not mentioned in the ALJ's decision, this Magistrate would also add to Plaintiff's questionable credibility the fact that he testified he never earned his GED (Docket No. 11, p. 40 of 480), despite telling Ms. Gericke and Ms. Hartman he *had* received a GED (Docket No. 11, p. 266 of 480).

Based on a complete review of the record, it is clear that Plaintiff's credibility is less than perfect. Therefore, Plaintiff's assignment of error is without merit and the Magistrate recommends the decision of the Commissioner be affirmed.

### 6.  PLAINTIFF'S OBESITY

Plaintiff next argues the ALJ failed to properly consider Plaintiff's obesity, which was deemed a severe impairment, throughout his entire analysis (Docket No. 15, p. 21 of 27). Specifically, Plaintiff argues the ALJ is required to look at the impact of Plaintiff's obesity over the entire period of disability, not merely on the administrative hearing date (Docket No. 15, p. 21 of 27).

The Social Security Administration's policy and protocol on the evaluation of obesity is explained at Social Security Ruling 02-1p:

> Obesity is a risk factor that increases an individual's chances of developing impairments in most body systems. It commonly leads to, and often complicates, chronic diseases of the cardiovascular, respiratory, and musculoskeletal body systems. Obesity increases the risk of developing impairments such as type II (so-called adult onset) diabetes mellitus-even in children; gall bladder disease; hypertension; heart disease; peripheral vascular disease; dyslipidemia (abnormal levels of fatty substances in the blood); stroke; osteoarthritis; and sleep apnea. It is associated with endometrial, breast, prostate, and colon cancers, and other physical impairments. Obesity may also cause or contribute to mental impairments such as depression. The effects of obesity may be subtle, such as the loss of mental clarity or slowed reactions that may result from obesity-related sleep apnea.

2002 SSR LEXIS 1, *6-*7 (Sept. 12, 2002 (internal citations omitted). The statement further recognizes that a claimant's obesity could affect his exertional limitations and must be considered at steps four and five as follows:

> Obesity can cause limitations of function. The functions likely to be limited depend on many factors, including where the excess weight is carried. An individual may have limitations in any of the external functions such as sitting, standing, walking, lifting, carrying, pushing, and pulling. It may also affect ability to do postural functions, such as climbing, balance, stooping, and crouching. The ability to manipulate may be affected by the presence of adipose (fatty) tissue in the hands and fingers. The ability to tolerate extreme heat, humidity, or hazards may also be affected.

2002 SSR LEXIS 1, at *16 (internal citations omitted).

Sixth Circuit courts have explained that the Ruling "does not mandate a particular mode of analysis but merely directs an ALJ to consider the claimant's obesity, in combination with other impairments, at all stages of the sequential evaluation." *Sleight v. Commissioner of Social Security*, 896 F.Supp.2d 622, 630-31 (E.D. Mich. 2012) (*citing Nejat v. Commissioner of Social Security*, 359 Fed.Appx. 574, 577 (6th Cir. 2009) (*quoting Bledsoe v. Barnhart*, 165 Fed.Appx. 408, 411–412 (6th Cir. 2006)).  As the Ruling states,

> . . . we will not make assumptions about the severity or functional effects of obesity

33

combined with other impairments. Obesity in combination with another impairment may or may not increase the severity or functional limitations of the other impairment. We will evaluate each case based on the information in the case record.

2002 SSR LEXIS 1, at *15.

ALJ Belford found Plaintiff's long-term obesity to be a severe impairment at step two (Docket No. 11, p. 58 of 480). He also considered Plaintiff's obesity during his assessment of Plaintiff's residual functional capacity (Docket No. 11, p. 63 of 480). Contrary to Plaintiff's belief, the ALJ did not minimize Plaintiff's obesity by noting his current weight and recent weight loss (Docket No. 15, p. 21 of 27). As noted above, obesity, "in combination with another impairment may or may not increase the severity or functional limitations of the other impairment." 2002 SSR LEXIS 1, at *15. There is nothing in the record to suggest Plaintiff suffers any functional limitations due to his obesity (Docket No. 11, pp. 242-480 of 480). In fact, even Dr. Bowman, who was the most familiar with Plaintiff's symptoms and weight issues, found Plaintiff capable of working despite his size (Docket No. 11, pp. 471-75 of 480). Therefore, Plaintiff's assignment of error is without merit and the Magistrate recommends the decision of the Commissioner be affirmed.

### 7. HYPOTHETICAL QUESTION

Plaintiff alleges the ALJ failed to pose a hypothetical question based on the substantial evidence contained in the record (Docket No. 15, pp. 22-24 of 27). Specifically, Plaintiff claims the ALJ failed to include information about medication side effects, Plaintiff's inability to control his emotions, and speed and pace-based limitations (Docket No. 15, pp. 22-24 of 27). In the Sixth Circuit, in order to be considered substantial evidence, a VE's testimony must be based on a hypothetical question which accurately portrays the claimant's physical and mental impairments. *See Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987). However, it is also "well

34

established that an ALJ . . . is required to incorporate only those limitations accepted as credible by the finder of fact" into the hypothetical question. *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993).

Here, ALJ Belford's hypothetical included a number of limitations, including only light exertional work, occasional climbing of ramps or stairs, occasional stooping, crouching, kneeling, and crawling, overhead reaching which could not exceed five pounds, simple routine work with only occasional interaction with the public, a sit/stand option, and standing, walking, and sitting limitations (Docket No. 11, pp. 42-44 of 480). Although Plaintiff goes on at length in his brief about the side effects of his Vicodin (Docket No. 15, pp. 15-16, 22-23 of 27), there is no evidence in the record to suggest Plaintiff suffers any functional impairments from these side effects.

As noted above, Plaintiff was on numerous medications, including Acetaminophen/Hydrocodone, Crestor, Gabapentin, Viagra, and Vicodin (Docket No. 11, p. 450 of 480). Plaintiff testified the Vicodin made him tired, drowsy, forgetful, and dizzy (Docket No. 11, p. 31 of 480); however, there was no objective evidence of these side effects in the record (Docket No. 11, pp. 242-480 of 480). Plaintiff was first prescribed Vicodin in July 2010 (Docket No. 11, p. 374 of 480). The record contains at least eight subsequent medical records, none of which mention Plaintiff's Vicodin side effects (Docket No. 11, pp. 370, 374, 450, 452-58, 459, 461-62, 463, 464, 466 of 480). Furthermore, although Plaintiff testified he requires a nap after taking the Vicodin, Plaintiff is only supposed to take the Vicodin twice a day, once in the morning and once at night (Docket No. 11, p. 450 of 480). Contrary to what Plaintiff argues, he would not need to take multiple naps throughout the day because of his Vicodin use (Docket No. 15, p. 16 of 27). ALJ Belford failed to find Plaintiff's allegations of severe side effects to be credible. Therefore, he was not required to include them in his

35

hypothetical question.

With regard to speed- and pace-based limitations, Plaintiff relies on *Ealy v. Comm'r of Soc. Sec.* (594 F.3d 504 (6th Cir. 2010)), for the proposition that the ALJ's hypothetical question must include pace or speed-based restrictions given his conclusion that Plaintiff required simple and routine work (Docket No. 15, p. 23 of 27). Plaintiff is incorrect. In *Ealy*, the plaintiff's doctor *specifically* limited him to "simple repetitive tasks [for] [two-hour] segments over an eight-hour day where speed was not critical." 594 F.3d at 516. In the case at hand, neither Dr. Bowman nor any other professional has placed Plaintiff under such a severe restriction (Docket No. 11, pp. 242-480 of 480).

Although Dr. Kuna found Plaintiff to have moderate difficulties with regard to concentration, persistence, or pace (Docket No. 11, pp. 59, 392 of 480), this Court has noted

> *Ealy* does not require further limitations in addition to limiting a claimant to simple repetitive tasks for every individual found to have moderate difficulties in concentration, persistence, or pace. Instead, *Ealy* stands for a limited, fact-based ruling in which the claimant's particular moderate limitations required additional speed- and pace-based restrictions.

*Jackson v. Comm'r of Soc. Sec.*, 2011 U.S. Dist. LEXIS 120476, *11 (N.D. Ohio 2011). Here, unlike in *Ealy*, Plaintiff refers to no objective evidence to suggest he had any greater limitations than those identified by ALJ Belford in his posed hypothetical question (Docket No. 11, pp. 242-480 of 480). Therefore, Plaintiff's assignment of error is without merit and the Magistrate recommends the decision of the Commissioner be affirmed.

### 8.    VE TESTIMONY

Finally, Plaintiff alleges the ALJ erred by relying on data provided by the VE with regard to the number of available positions for "other work" without validating the VE's methodology (Docket No. 15, pp. 24-26 of 27). Specifically, Plaintiff alleges the VE's numbers were inconclusive because the

36

VE could only provide numbers for the industry encompassing the provided DOT codes, not the specific jobs (Docket No. 15, p. 25 of 27). Plaintiff's argument is without merit.

The Sixth Circuit has held, in accordance with Social Security Ruling 00-04p, that when making a disability determination, an ALJ is

> permitted to consider reliable job information available from various publications as evidence of the claimant's ability to do other work that exists in the national economy. Such publications include the DOT, which provides information about jobs (classified by their exertional and skill requirements) that exist in the national economy. ALJs are also authorized to consider the testimony of so-called vocational experts . . . as a source of occupational evidence.

> On occasion, a VE's testimony conflicts with the information set forth in the DOT. In an effort to insure that such actual or apparent conflicts are addressed, the Social Security Administration has imposed an affirmative duty on ALJs to ask the VE if the evidence that he or she has provided conflicts with the information provided in the DOT.

*Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601, 603-06 (6th Cir. 2009). Here, the VE testified her numbers were based on information from the DOT, the U.S. Department of Labor Bureau of Statistics, and her own experience (Docket No. 11, pp. 43, 49 of 480). Therefore, ALJ Belford was permitted to rely on the VE's testimony in conducting his analysis at step five. Plaintiff's assignment of error is without merit and the Magistrate recommends the decision of the Commissioner be affirmed.

## VIII. CONCLUSION

For the foregoing reasons, this Magistrate recommends the decision of the Commissioner be affirmed.

/s/Vernelis K. Armstrong
United States Magistrate Judge

Date:  July 9, 2013

## IX. NOTICE

Please take notice that as of this date the Magistrate's report and recommendation attached hereto has been filed. Pursuant to Rule 72.3(b) of the LOCAL RULES FOR NORTHERN DISTRICT OF OHIO, any party may object to the report and recommendations within fourteen (14) days after being served with a copy thereof. Failure to file a timely objection within the fourteen-day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure. The objecting party shall file the written objections with the Clerk of Court, and serve on the Magistrate Judge and all

38

parties, which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. Any party may respond to another party's objections within fourteen days after being served with a copy thereof.

Please note that the Sixth Circuit Court of Appeals determined in *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981) that failure to file a timely objection to a Magistrate's report and recommendation foreclosed appeal to the court of appeals. In *Thomas v. Arn*, 106 S.Ct. 466 (1985), the Supreme Court upheld that authority of the court of appeals to condition the right of appeal on the filing of timely objections to a report and recommendation.