IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

JEFFREY A. GUYER,

                Plaintiff,                Case No. 3:12 cv 2519

  -vs-

                                                 <u>MEMORANDUM   OPINION</u>

COMMISSIONER OF SOCIAL SECURITY,

                Defendant.

KATZ, J.

      Jeffery A. Guyer applied for social security disability insurance benefits and for supplemental security income benefits with the Social Security Administration. After exhausting his available administrative remedies, the Commissioner of Social Security subsequently denied Guyer's applications.

      Guyer then sought judicial review of the Commissioner's decision. The case was referred to Magistrate Judge Vernelis K. Armstrong for findings of facts, conclusions of law, and recommendations. The Magistrate Judge issued a report recommending that this Court affirm the Commissioner's decision denying Guyer's applications for benefits. This matter is before the Court pursuant to Guyer's timely objections to the Magistrate Judge's report.

      The Court has jurisdiction over the Commissioner's final decision denying Guyer's request for benefits pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 832 (6th Cir. 2006). In accordance with *United States v. Curtis*, 237 F.3d 598, 602–03 (6th Cir. 2001), this Court has made a de novo determination of the Magistrate Judge's report. For the reasons stated below, the Court adopts the report in part, and remands the case to the Commissioner for further proceedings consistent with this opinion.

## I. Standard of Review

This Court conducts a de novo review of those portions of the Magistrate Judge's report to which Guyer objects. 28 U.S.C. § 636(b)(1). In so doing, this Court reviews the Commissioner's decision to determine whether it is supported by substantial evidence. 42 U.S.C. § 405(g). This Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). The Court does not re-weigh the evidence, but must affirm the Commissioner's findings as long as there is substantial evidence to support those findings, even if this Court would have decided the matter differently, and even if there is substantial evidence supporting the claimant's position. *See Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). Substantial evidence is more than a scintilla of evidence, but less than a preponderance. It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Kyle v. Comm'r of Soc. Sec.*, 609 F.3d 847, 854 (6th Cir. 2010) (citations and internal quotation marks omitted). The Commissioner's decision is not subject to reversal merely because substantial evidence exists in the record to support a different conclusion. *Id.* at 854–55.

## II. Discussion

Because Guyer has not objected to the Magistrate Judge's factual summary of the case as set forth on pages two through twenty-one of the report, the Court adopts the Magistrate Judge's findings. The Magistrate Judge's uncontested summary of the case is as follows:

> **II. PROCEDURAL BACKGROUND**
> On April 3, 2009, Plaintiff filed an application for a period of DIB under Title II of the Social Security Act, 42 U.S.C. §§ 416(I) and 423 (Docket No. 11, p. 150 of 480). On April 15, 2009, Plaintiff filed an application for SSI under Title

XVI of the Social Security Act, 42 U.S.C. § 1381 (Docket No. 11, p. 157 of 480). In both applications, Plaintiff alleged a period of disability beginning July 9, 2008 (Docket No. 11, pp. 150, 157 of 480). Plaintiff's claims were denied initially on June 23, 2009 (Docket No. 11, pp. 81, 88 of 480), and upon reconsideration on November 19, 2009 (Docket No. 11, pp. 97, 103 of 480). Plaintiff thereafter filed a timely written request for a hearing on January 19, 2010 (Docket No. 11, p. 110 of 480).

On February 24, 2011, Plaintiff appeared with counsel for a hearing before Administrative Law Judge Timothy Belford ("ALJ Belford") (Docket No. 11, pp. 21-52 of 480). Also appearing at the hearing was an impartial Vocational Expert ("VE") (Docket No. 11, pp. 42-51 of 480). ALJ Belford found Plaintiff to have a severe combination of disc herniation at L5-S1, status post spinal fusion, obesity, and Major Depressive Disorder with an onset date of July 9, 2008 (Docket No. 11, p. 58 of 480).

Despite these limitations, ALJ Belford determined, based on all the evidence presented, that Plaintiff had not been disabled within the meaning of the Social Security Act at any time from the alleged onset date through the date of his decision (Docket No. 11, p. 67 of 480). ALJ Belford found Plaintiff had the residual functional capacity to perform light work with the following exceptions:

1. Lift, carry, push, and pull twenty pounds occasionally and ten pounds frequently

2. Limited to standing for four hours during an eight-hour workday

3. Limited to walking for two hours during an eight-hour workday

4. Limited to sitting for six hours during an eight-hour workday

5. Requires a sit/stand option

6. Limited to only occasionally climbing ramps or stairs, stooping, crouching, kneeling, and crawling

7. Only occasional overhead reaching of not more than five pounds

8. Limited to simple routine work with only occasional interaction with the public

(Docket No. 11, p. 60 of 480). Plaintiff's request for benefits was therefore denied (Docket No. 11, p. 67 of 480).

On October 9, 2012, Plaintiff filed a Complaint in the Northern District of Ohio, Western Division, seeking judicial review of his denial of DIB and SSI (Docket No. 1). In his pleading, Plaintiff alleged the ALJ erred by failing to: (1) address Plaintiff's

numerous medications; (2) abide by the treating physician rule; (3) specify the specific requirements of Plaintiff's sit/stand option; (4) find Plaintiff was limited to sedentary work, given his limited ability to reach overhead; (5) assign Plaintiff's subjective statements full credibility; (6) properly consider Plaintiff's obesity; (7) pose an accurate and complete hypothetical question to the VE; and (8) demand more specific employment numbers from the VE (Docket No. 15). Defendant filed its Answer on January 4, 2013 (Docket No. 10).

### III. FACTUAL BACKGROUND
#### A. THE ADMINISTRATIVE HEARING

An administrative hearing convened on February 24, 2011, in Toledo, Ohio (Docket No. 11, pp. 21-52 of 480). Plaintiff, represented by attorney David Friedes, appeared and testified (Docket No. 11, pp. 24-41 of 480). Also present and testifying was VE Dr. Vanessa Harris ("Dr. Harris") (Docket No. 11, pp. 42-51 of 480).

#### 1. PLAINTIFF'S TESTIMONY

Plaintiff testified that he resided alone (Docket No. 11, pp. 24-25 of 480). He did not graduate from high school and denied earning a GED (Docket No. 11, pp. 25, 40 of 480). Plaintiff did receive vocational training for auto mechanics (Docket No. 11 p. 25 of 480). Plaintiff has his driver's license and can drive, although he has difficulty with long distances (Docket No. 11, p. 36 of 480). Prior to his alleged disability, Plaintiff worked as an auto mechanic for Campbell's Soup Company for eighteen years (Docket No. 11, p. 25 of 480). He currently has long-term disability (Docket No. 11, p. 26 of 480). When asked what prevented him from returning to work, Plaintiff testified he has lower back problems, including stabbing pains down his legs, and numbness and tingling in his feet (Docket No. 11, p. 26 of 480).

Plaintiff gave testimony concerning a number of his alleged impairments, including his back pain and depression (Docket No. 11, pp. 24-41 of 480). With regard to his back pain, Plaintiff stated he had surgery, but his pain has since gotten worse (Docket No. 11, pp. 26-27 of 480). Any activity aggravates the pain, which is constant (Docket No. 11, p. 27 of 480). He sometimes obtains relief by laying on his side with a pillow between his knees (Docket No. 11, p. 27 of 480). Plaintiff is on a variety of medications for his back pain, including Neurontin, Gabapentin, and Vicodin (Docket No. 11, p. 27 of 480). Plaintiff testified that, as a result of the Vicodin, he becomes tired, drowsy, forgetful, and dizzy (Docket No. 11, p. 31 of 480). This drowsiness requires Plaintiff to take up to three one to two-hour naps during the day (Doc acupuncture therapy, but testified he did not obtain any relief (Docket No. 11, p. 27 of 480). Plaintiff has difficulty bending forward, and is only able to lean forward a quarter to halfway before the pain becomes too much (Docket No. 11, pp. 29, 31 of 480). Plaintiff also indicated he has difficulty reaching above his head (Docket No. 11, p. 29 of 480).

When asked about his mental health, Plaintiff testified he suffers from depression because of his back issues (Docket No. 11, p. 32 of 480). He has some

4

difficulty with memory and retaining information he reads (Docket No. 11, pp. 35, 40 of 480). Plaintiff also testified he has lost weight because he has not had much of an appetite (Docket No. 11, p. 39 of 480). Plaintiff was prescribed Fluoxetine[1] for his depression (Docket No. 11, p. 32 of 480).

### 2. VOCATIONAL EXPERT TESTIMONY

Having familiarized herself with Plaintiff's file and vocational background prior to the hearing, the VE described Plaintiff's past work as a maintenance mechanic as heavy and skilled (Docket No. 11, p. 235 of 480). ALJ Belford then posed the following hypothetical question:

> I want you to consider [a] hypothetical individual limited to light exertional work. That would be limited to occasional climbing [of] ramps or stairs, occasional stooping, crouching, kneeling and crawling with only occasional overhead reaching not more than five pounds. Further limited to simple routine work with only occasional interaction with the public. Would there be any jobs in the national economy that such an individual could perform?

(Docket No. 11, p. 42 of 480). Taking into account these limitations, the VE testified there was other work the hypothetical person could perform, including: (1) binder, listed under DOT[2] 920.687-190, for which there are 499,800 positions nationally and 4,900 regionally; (2) wrapper, listed under DOT 318.687-018, for which there are 521,000 positions nationally and 3,200 regionally; and (3) injection mold machine tender, listed under DOT 556.685-086, for which there are 135,700 positions nationally and 1,000 regionally (Docket No. 11, pp. 42-43 of 480).

ALJ Belford then added to his hypothetical, stating "[i]f there is a further restriction in that . . . the hypothetical individual would need the ability to change positions from a standing to a sitting position on an as needed basis, would he be able to perform any of those jobs?" (Docket No. 11, p. 43 of 480). Dr. Harris indicated an individual "could actually sit or stand at will and employers have stools and benches in the work place" for these provided positions (Docket No. 11, p. 43 of 480). She further indicated this restriction would not reduce the number of available jobs, based on her experience in the field (Docket No. 11, p. 43 of 480).

The ALJ again added to his original hypothetical, stating:
I want you to consider an additional limitation where they would be able to do light work . . . with the exception of . . . only be able to stand for four hours in an eight hour day total and would only be able to walk for two hours in an eight hour day total. Would that change any of the available number of these jobs?"

---

[1] A generic version of Prozac. MOSBY'S MEDICAL DRUG REFERENCE (2002).

[2] Dictionary of Occupational Titles.

5

(Docket No. 11, pp. 43-44 of 480). The VE indicated this additional limitation would not change the jobs available (Docket No. 11, p. 44 of 480).
      On cross-examination, counsel provided a very lengthy hypothetical question, summarized as follows:

So let me give you a hypothetical if you will. I'm going to give you one based on pretty much the sit stand and physical requirements that the judge [gave] to you but I'd like you to also assume that this person should not squat at all, should not crawl at all, should not climb at all. I'd like you to assume that the person has moderate restrictions against moving machinery, changes in temperature, humidity, driving, dusts, fumes and gases.

From a mental stand point . . . [a]ssume for me that severe and extreme ability to function in most areas due to continuous impairments . . . Assume that the areas that I'm talking about mental limitations would be an inability to maintain safety [of] self and others for example fear of suicidal thoughts, homicidal urges, self destructive behaviors.

The ability to . . . do goals, carry out things perform things in a timely manner, meet expectations is only moderately limited . . . and . . . be able to comprehend and follow instructions being moderately affected. Maintain work pace, production work load expectations moderately impaired and respond appropriately to supervision . . . moderately [impaired] and performing work and contacting with others . . . mildly limited. Moderately again, the ability to generalize, evaluate and make independent decisions . . . able to interact with customers . . . moderately [impaired]; ability to accept and carry out responsibility, direction, control and planning tasks moderately [impaired]. Perform complex tasks requiring higher levels moderately [impaired]; supervise and manage others moderately [impaired].

If you put them altogether would such an individual . . . be able to carry out the kinds of work that you've indicated as alternate work?

(Docket No. 11, pp. 45-48 of 480). The VE responded in the negative because the individual would be off task one-third to two-thirds of the day (Docket No. 11, p. 48 of 480).

**B. MEDICAL RECORDS**
      Plaintiff's medical records date back to April 26, 2005, when Plaintiff saw Dr. Scott T. Dull, MD ("Dr. Dull") complaining of constant lower back pain and intermittent leg and foot pain (Docket No. 11, p. 282 of 480). Plaintiff's gait was

slow but steady and he displayed a negative straight leg raise[3] and Patrick test[4] (Docket No. 11, p. 283 of 480). Leaning or sitting seemed to aggravate his symptoms and heel and toe walking were slightly difficult (Docket No. 11, pp. 282, 283 of 480). Plaintiff's back showed some tenderness along the midline in the lumbosacral area (Docket No. 11, p. 283 of 480). He was partially able to complete a deep knee bend and return (Docket No. 11, p. 283 of 480). Plaintiff was diagnosed with a central disc herniation and aggravation of his pre-existing degenerative disc disease (Docket No. 11, p. 283 of 480).

Plaintiff's next visit came nearly a year later when he saw Dr. Joseph S. Krueger, MD ("Dr. Krueger") complaining of increasing back pain, especially, Plaintiff noted, after he attempted to lift a twenty-pound box in his garage (Docket No. 11, p. 330 of 480). Plaintiff had a somewhat slow gait and experienced pain with a straight leg raise to eighty degrees bilaterally (Docket No. 11, p. 330 of 480). He also had tenderness to palpation in the lower lumbar region along the paraspinal musculature (Docket No. 11, p. 330 of 480). Plaintiff was diagnosed with back pain and a probable recurring herniated disc (Docket No. 11, p. 330 of 480). He was prescribed Relafen and Darvocet (Docket No. 11, p. 330 of 480).

On March 27, 2006, Plaintiff saw Dr. Randall J. Bowman, MD ("Dr. Bowman"), his primary physician, complaining of lower back pain (Docket No. 11, p. 329 of 480). Plaintiff claimed his symptoms had only minimally improved since he saw Dr. Krueger (Docket No. 11, p. 329 of 480). Tension was noted throughout Plaintiff's lower back and his lumbar flexion was limited (Docket No. 11, p. 329 of 480). Plaintiff had a questionable positive straight-leg test (Docket No. 11, p. 329 of 480). Dr. Bowman recommended physical therapy, including aquatic therapy (Docket No. 11, p. 329 of 480). Plaintiff was limited to bending only twenty to forty-five degrees and was ordered to refrain from all climbing and overhead work until May 1, 2006 (Docket No. 11, p. 329 of 480).

Plaintiff's records then jump to June 9, 2007, when he underwent imaging on his spine and chest (Docket No. 11, pp. 348-50 of 480). Results were unremarkable for both sequences (Docket No. 11, pp. 348-50 of 480). On June 11, 2007, Plaintiff saw Dr. Bowman complaining of left arm numbness and a ringing in his right ear (Docket No. 11, p. 327 of 480). Plaintiff stated he reduced his tobacco use from one pack per day to four cigarettes per day (Docket No. 11, p. 327 of

---

[3] Also known as a Lasegue's sign. Present in several abnormal conditions [such] as a disorder in the lower vertebrae of the spine . . . and sciatica. ATTORNEYS' DICTIONARY OF MEDICINE, L-66118 (2009).

[4] A test which helps to distinguish arthritis of the hip joint from sciatica. With the patient lying on his back, the thigh and knee are flexed and that external malleoulus (the knuckle on the outside of the ankle) is placed on or above the kneecap of the other leg. This procedure is generally accomplished without pain. The knee of the flexed leg is pressed down by the examiner, and if this causes pain, it is assumed that the condition involved is arthritis of the hip joint rather than sciatica. ATTORNEYS' DICTIONARY OF MEDICINE, P-88280 (2009).

480). Plaintiff was encouraged to stop smoking altogether (Docket No. 11, p. 327 of 480). The next day, June 12, 2007, Plaintiff underwent an arterial Doppler examination and ultrasound on his left arm and ankles (Docket No. 11, pp. 346, 347 of 480). The tests showed normal arterial pressures, indices, and waveform in both forearms and ankles (Docket No. 11, pp. 346, 347 of 480).

Plaintiff returned to Dr. Bowman on June 15, 2007, claiming he woke up feeling shaky, sweaty, and tense (Docket No. 11, p. 325 of 480). Plaintiff also stated his left arm remained numb (Docket No. 11, p. 325 of 480). Dr. Bowman noted Plaintiff had recently been on an antiobiotic for gum disease, which seemed to help his symptoms (Docket No. 11, p. 325 of 480). Plaintiff stated he had stopped smoking (Docket No. 11, p. 325 of 480). Dr. Bowman diagnosed Plaintiff with probable carpal tunnel syndrome and requested Plaintiff undergo a four-hour glucose tolerance test (Docket No. 11, p. 325 of 480).

On July 13, 2007, Plaintiff returned to Dr. Bowman complaining of shaking, sweating, and insomnia (Docket No. 11, p. 324 of 480). At that time, Dr. Bowman noted Plaintiff showed evidence of reactive hypoglycemia (Docket No. 11, p. 324 of 480). Dr. Bowman encouraged Plaintiff to eat small meals and avoid concentrated sweets (Docket No. 11, p. 324 of 480). Plaintiff saw Dr. Bowman again on September 18, 2007, still reporting shaking and sweating (Docket No. 11, p. 323 of 480). He demonstrated evidence of reactive hypoglycemia with a two-hour blood sugar of fifty-nine (Docket No. 11, p. 323 of 480). Plaintiff was instructed to eat every two hours and avoid consumption of concentrated sweets (Docket No. 11, p. 323 of 480).

On January 2, 2008, Plaintiff underwent an MRI of his spine (Docket No. 11, p. 344 of 480). The test revealed a moderate size posterior disc extrusion at the L5-S1 vertebrae, which was abutting and slightly displacing the intracanalicular left-sided nerve root, the likely culprit of Plaintiff's lower back pain (Docket No. 11, p. 344 of 480). There was also evidence of small posterior focal annulus tears (Docket No. 11, p. 344 of 480).

Plaintiff saw Dr. Patrick McCormick, MD ("Dr. McCormick") on February 4, 2008, complaining of mechanical lower back pain and bilateral lower extremity radicular pain, which was more pronounced on his left side (Docket No. 11, p. 279 of 480). His symptoms increased with weight-bearing activity and Plaintiff rated his pain between four and nine out of a possible ten (Docket No. 11, p. 279 of 480). Plaintiff had a forward-leaning station and antalgic gait, but his balance was normal (Docket No. 11, p. 280 of 480). He had restricted range of motion in his hip and knee, but this was not associated with any discomfort (Docket No. 11, p. 280 of 480). Plaintiff also had limited range of motion in his lumbar spine, which was uncomfortable and tender (Docket No. 11, p. 280 of 480). Dr. McCormick discussed with Plaintiff the fact that his pain was suggestive of bilateral L5 radiculopathy, which likely stemmed from a foraminal compromise at the L5-S1 level (Docket No. 11, p. 280 of 480). Plaintiff elected to proceed with surgery (Docket No. 11, p. 280 of 480). Plaintiff's surgery was confirmed on June 30, 2008 (Docket No. 11, pp. 277-78 of 480).

On July 10, 2008, Plaintiff underwent back surgery with Dr. McCormick (Docket No. 11, pp. 252, 437 of 480). The surgery included a posterior lumbar interbody fusion at the L5-S1 vertebrae, a lumbar segmental fixation at the L5-S1 vertebrae, implantation of an intradiscal fusion device, and harvesting of morselized bone graft (Docket No. 11, pp. 252, 437 of 480). Immediately after surgery Plaintiff rated his pain at level five, but noted that when he moved, it increased to level eight or nine (Docket No. 11, pp. 251 of 480).

Plaintiff returned to Dr. McCormick on August 25, 2008 (Docket No. 11, pp. 275, 301 of 480). He claimed to be experiencing pain that radiated into his buttocks and groin with weight-bearing activity (Docket No. 11, pp. 275, 301 of 480). Dr. McCormick recommended Plaintiff follow through with physical therapy and remain off work for twelve weeks (Docket No. 11, pp. 275, 301 of 480). On November 17, 2008, Plaintiff reported to Dr. McCormick no improvement in his back and stated the physical therapy was making things worse (Docket No. 11, pp. 273, 299 of 480). Plaintiff complained of a tingling sensation in his feet, significant back pain, and a limited ability to bend, lift, stoop, and rotate at the trunk (Docket No. 11, pp. 273, 299 of 480). Dr. Bowman suggested Plaintiff resume physical therapy (Docket No. 11, pp. 273, 299 of 480). Views of Plaintiff's lumbar spine revealed no acute bony abnormality (Docket No. 11, pp. 243, 295, 341 of 480).

On December 10, 2008, Plaintiff underwent an MRI of his lumbar spine (Docket No. 11, pp. 293, 339 of 480). This revealed small lateral disc bulges at the L3-L4 vertebrae, a small diffuse annular disc bulge at the L4-L5 vertebrae without significant compromise of the foramina, and a recurrent small broad-based posterior central disc protrusion (Docket No. 11, pp. 293, 339 of 480). Plaintiff was diagnosed with minor multi-level disc bulges which did not compromise the canal or foramina at any level (Docket No. 11, pp. 293, 339 of 480).

Plaintiff returned to Dr. McCormick on February 2, 2009 (Docket No. 11, pp. 272, 298 of 480). Dr. McCormick noted Plaintiff was making satisfactory progress and had diminished pain and improved functional capabilities (Docket No. 11, pp. 272, 298 of 480). Plaintiff also had normal segmental strength and sensation (Docket No. 11, pp. 272, 298 of 480). On February 18, 2009, Plaintiff saw Dr. Bowman, who prescribed Gabapentin and applied a Flector patch (Docket No. 11, p. 292 of 480).

During a follow-up appointment with Dr. Bowman on March 11, 2009, Dr. Bowman noted that Dr. McCormick reported Plaintiff had reached maximum medical improvement (Docket No. 11, p. 291 of 480). Plaintiff presented with restricted flexibility in his lower extremities and had a positive straight leg raise test bilaterally (Docket No. 11, p. 291 of 480). Plaintiff reported he never filled the prescription for Gabapentin because he was nervous about its side effects (Docket No. 11, p. 291 of 480). Dr. Bowman found Plaintiff to be at maximum medical improvement and encouraged him to try the Gabapentin (Docket No. 11, p. 291 of 480).

Plaintiff returned to Dr. Bowman on May 6, 2009, complaining of lower back pain (Docket No. 11, p. 290 of 480). Plaintiff was taking Neurontin and using

a Flector patch, which he reported provided a "modicum of relief" (Docket No. 11, p. 290 of 480). Plaintiff had pain with the extension of his back to an upright position, flexion, and lateral extension (Docket No. 11, p. 290 of 480). He also suffered from an antalgic gait and markedly limited lumbar flexibility and pain across his back upon palpation (Docket No. 11, p. 290 of 480). Dr. Bowman recommended Plaintiff continue use of the Flector patch (Docket No. 11, p. 290 of 480).

On December 7, 2009, Plaintiff reported to the Fulton County Health Center Rehabilitation Department ("Fulton County Rehab") complaining of difficulty walking and completing activities of daily living (Docket No. 11, p. 380 of 480). Plaintiff rated his pain between six and nine out of a possible ten (Docket No. 11, p. 380 of 480). He indicated he had difficulty going up and down the stairs and putting on his socks and shoes (Docket No. 11, p. 380 of 480). Plaintiff also complained of numbness and tingling in both feet, accompanied by a burning sensation (Docket No. 11, p. 380 of 480). Lower trunk rotation increased his pain (Docket No. 11, p. 380 of 480). Plaintiff demonstrated a positive straight leg raise test bilaterally at forty-five degrees (Docket No. 11, p. 380 of 480). He ambulated with an antalgic gait on his left leg, demonstrating a decreased right step length (Docket No. 11, p. 380 of 480). Plaintiff also had pain throughout his lumbar region and bilateral hips, sensitive even to light touch (Docket No. 11, p. 380 of 480). Physical therapist Sarrah B. Zeiter ("Ms. Zeiter") reported Plaintiff's rehabilitation potential was good and recommended he undergo therapy three times per week for three weeks (Docket No. 11, pp. 378, 380, 381 of 480).

Plaintiff reported to the Fulton County Health Center Emergency Room ("Fulton County ER") on July 12, 2010, complaining of lower back pain after having twisted it (Docket No. 11, p. 374 of 480). Plaintiff described the pain as "stabbing" and rated it as an eight out of a possible ten (Docket No. 11, p. 374 of 480). Plaintiff had tenderness over his lumbar spine, but reported no numbness or weakness in his legs (Docket No. 11, p. 374 of 480). Plaintiff also reported smoking one pack of cigarettes per day (Docket No. 11, p. 374 of 480). Plaintiff was given Vicodin and a Toradol injection and was discharged (Docket No. 11, p. 374 of 480).

Plaintiff returned to the Fulton County ER on July 29, 2010, complaining of an exacerbation of his chronic lower back pain (Docket No. 11, pp. 372, 467 of 480). Plaintiff stated his pain was in his lower back with radiation to the posterior mid-thigh (Docket No. 11, pp. 372, 467 of 480). Plaintiff also complained of muscle spasms in the lumbar area (Docket No. 11, pp. 372, 467 of 480). He had considerable pain upon palpation to his sacroiliac bilaterally (Docket No. 11, pp. 372, 467 of 480). Plaintiff was diagnosed with an acute exacerbation of his chronic lower back pain and given Vicodin and a Toradol injection (Docket No. 11, pp. 372, 467 of 480).

On August 2, 2010, Plaintiff saw Dr. Bowman and complained of lower back pain and spasms, which prevented him from getting comfortable (Docket No. 11, p. 465 of 480). Plaintiff had an antalgic gait and had difficulty with both toe

and heel walking (Docket No. 11, p. 465 of 480). He had extensive tenderness with palpation in his lower thoracic and lumbar regions (Docket No. 11, p. 465 of 480). Plaintiff was prescribed Vicodin (Docket No. 11, p. 466 of 480). On August 13, 2010, Plaintiff underwent an MRI of his lumbar spine (Docket No. 11, pp. 370, 464 of 480). The test revealed chronic degenerative changes at the L5-S1 vertebrae accompanied by a small, broad-based posterior disc protrusion, old laminectomy, and old posterior fusion (Docket No. 11, pp. 370, 464 of 480). The MRI showed no significant compromise of the canal or foramina, and essentially no change from Plaintiff's December 2008 MRI (Docket No. 11, pp. 370, 464 of 480).

Plaintiff returned to Dr. Bowman on August 18, 2010 (Docket No. 11, p. 463 of 480). Plaintiff reported taking numerous medications, including Arthrotec, Crestor, Gabapentin, Viagra, and Vicodin (Docket No. 11, p. 463 of 480). At that time, Dr. Bowman noted Plaintiff was not a surgical candidate and suggested Plaintiff try acupuncture (Docket No. 11, p. 463 of 480). Plaintiff met with Dr. Larry Kennedy, MD ("Dr. Kennedy") on August 25, 2010, for an acupuncture trial (Docket No. 11, p. 461 of 480). Plaintiff was tender in his lumbosacral paraspinals and gluteal region and directly over his coccyx (Docket No. 11, p. 461 of 480). His range of motion was reduced by at least fifty percent and a straight leg test caused some increased back pain bilaterally, but no radiating pain (Docket No. 11, p. 462 of 480). Plaintiff indicated he had been on Vicodin for the past six weeks, but had not been on any narcotics prior to this period (Docket No. 11, p. 461 of 480). Plaintiff elected to proceed with acupuncture (Docket No. 11, p. 462 of 480). He underwent a series of eight treatments from September 29, 2010, through December 15, 2010 (Docket No. 11, pp. 452-58 of 480). Plaintiff received no relief (Docket No. 11, pp. 452-58 of 480).

Plaintiff returned to Dr. Bowman on January 4, 2011, complaining of back pain and depression (Docket No. 11, p. 450 of 480). He refused psychological treatment (Docket No. 11, p. 450 of 480). At that time, Plaintiff was on a regimen of Acetaminophen, Crestor, Gabapentin, Viagra, and Vicodin (Docket No. 11, p. 450 of 480).

**C.    EVALUATIONS**
**1.    PHYSICAL RESIDUAL FUNCTIONAL CAPACITY ASSESSMENTS**

On January 20, 2009, Plaintiff underwent a Physical Residual Functional Capacity Assessment with occupational therapist Beth Gericke ("Ms. Gericke") and physical therapist Jessye Hartman ("Ms. Hartman") at the Fulton County Rehab Center (Docket No. 11, pp. 264-70 of 480). Plaintiff reported taking no prescription medication and complained of the following symptoms: (1) stabbing pain down his entire left leg; (2) groin pain; (3) occasional muscle spasms above his back brace; (4) pain at his surgery incision site; and (5) pain in both feet (Docket No. 11, p. 265 of 480). Plaintiff complained of significant nocturnal pain which prevented him from sleeping through the night (Docket No. 11, p. 266 of 480). He was unable to lean forward without pain (Docket No. 11, p. 266 of 480). Upon examination, Plaintiff complained of pain at a twenty-five-degree lumbar flexion (Docket No. 11, p. 266 of 480). Side bending was restricted bilaterally and

his bilateral lower extremity range of motion was grossly within functional limits (Docket No. 11, p. 266 of 480). Plaintiff tested positive bilaterally with a Slump test, and had a positive bilateral straight-leg raise at thirty degrees (Docket No. 11, p. 266 of 480). He was tender to palpation around his lumbar sacral region (Docket No. 11, p. 266 of 480). Plaintiff could sit for twenty-minutes, stand for thirty-nine minutes, and was able to kneel for one minute (Docket No. 11, p. 268 of 480). Plaintiff was unable to walk on a treadmill at one-half mile per hour, had difficulty squatting, and declined to bend at his trunk, crawl, or stoop (Docket No. 11, p. 268 of 480). The therapists recommended Plaintiff engage only in sedentary work (Docket No. 11, p. 270 of 480).

Six months later, on June 16, 2009, Plaintiff underwent a second Physical Residual Functional Capacity Assessment with state examiner Dr. Elizabeth Das, MD ("Dr. Das") (Docket No. 11, pp. 304-11 of 480). Dr. Das concluded Plaintiff could: (1) occasionally lift and/or carry twenty pounds; (2) frequently lift and/or carry ten pounds; (3) stand and/or walk for six hours during an eight-hour workday; (4) sit for six hours during an eight-hour workday; and (5) engage in unlimited pushing and pulling (Docket No. 11, p. 305 of 480). Plaintiff could occasionally climb ramps and stairs, balance, stoop, and crouch, but could never climb ladders, ropes, or scaffolds (Docket No. 11, p. 306 of 480). Plaintiff had no manipulative, visual, communicative, or environmental limitations (Docket No. 11, pp. 307-08 of 480).

On February 10, 2011, Dr. Bowman completed a Residual Functional Capacity Assessment (Docket No. 11, pp. 471-75 of 480). Dr. Bowman concluded Plaintiff suffered from chronic degenerative disc disease and opined that Plaintiff could sit for eight hours, stand for four hours, and walk for two hours during an eight-hour workday (Docket No. 11, p. 472 of 480). Plaintiff also required a sit/stand option (Docket No. 11, p. 472 of 480). Dr. Bowman found Plaintiff could lift and/or carry up to ten pounds frequently and up to twenty pounds occasionally (Docket No. 11, p. 473 of 480). Plaintiff could not use his feet for repetitive movement (Docket No. 11, p. 474 of 480). Plaintiff could occasionally bend, but never squat, crawl, or climb (Docket No. 11, p. 474 of 480). Dr. Bowman noted Plaintiff had moderate limitations with regard to most environmental hazards, including moving machinery, driving automotive equipment, and exposure to temperature extremes, dust, fumes, and gasses (Docket No. 11, p. 475 of 480).

**2.       PSYCHOLOGICAL EVALUATIONS**
    **a.       MARCH 9, 2010**

On March 9, 2010, Plaintiff underwent a psychological evaluation with Dr. Daniel J. Kuna, Ph.D ("Dr. Kuna") (Docket No. 11, pp. 391-93 of 480). Although cooperative with the evaluation, Plaintiff presented with a blunt affect and significant pain behavior (Docket No. 11, p. 392 of 480). He reported taking Neurontin three times per day and smoking one pack of cigarettes per day (Docket No. 11, p. 392 of 480). Plaintiff noted an increased sense of irritability and anger towards others, something he felt guilty about (Docket No. 11, p. 392 of 480). He suffered from a lack of motivation, given his pain (Docket No. 11, p. 392 of 480).

Plaintiff reported a fluctuating appetite, crying spells, concentration difficulties, increased apathy, lack of sexual interest, and social withdrawal (Docket No. 11, p. 392 of 480). Dr. Kuna diagnosed Plaintiff with Major Depressive Disorder ("MDD"), single episode, moderate, which he attributed to Plaintiff's industrial accident and failed surgery (Docket No. 11, p. 393 of 480).

### b. APRIL 30, 2010

Plaintiff participated in a second psychological evaluation, at the request of the Bureau of Worker's Compensation ("BWC"), with Dr. Christopher Layne, Ph.D ("Dr. Layne") on April 30, 2010 (Docket No. 11, pp. 422-29 of 480). At that time, Plaintiff complained of physical pain, depression, forgetfulness, and money and sex problems (Docket No. 11, p. 426 of 480). Upon examination, Dr. Layne found no evidence of Plaintiff's professed depression (Docket No. 11, p. 426 of 480). Plaintiff was dressed appropriately and maneuvered absent any pain behavior (Docket No. 11, p. 436 of 480). Dr. Layne noted Plaintiff did not display the expected "over-compliance" behavior; rather, Plaintiff was uncooperative (Docket No. 11, p. 426 of 480). Plaintiff failed to answer questions about his life before his accident and did not follow test instructions (Docket No. 11, p. 436 of 480). Plaintiff also refused to discuss his injury in any detail, choosing instead to leave and, according to Dr. Layne, "got up quickly and walked out fast - again, with no hints of pain, much less disabling pain" (Docket No. 11, p. 436 of 480).

Plaintiff displayed no signs of mood problems, including mood swings, crying, or pessimism (Docket No. 11, p. 426 of 480). He was "never anxious, had steady hands, an irritable, blunt voice, and . . . no sweating or gasping" (Docket No. 11, p. 426 of 480). Dr. Layne assessed Plaintiff's intelligence as average and his orientation as adequate (Docket No. 11, p. 426 of 480). He displayed no preoccupations, intrusive memories, or psychosis (Docket No. 11, p. 426 of 480).

Dr. Layne opined that Plaintiff did not suffer from depression or any mental disability (Docket No. 11, p. 428 of 480). According to Dr. Layne, Plaintiff "had not stayed home; he traveled with his girlfriend and saw other friends. He worked on old cars. He never took antidepressants . . . He shunned vocational rehabilitation, not because of depression, but because it threatened the disability money . . . he showed inflated self-confidence, energy, assertiveness, anger, and lack of cooperation" (Docket No. 11, p. 427 of 480). Further, Plaintiff had no cognitive problems, was able to understand and follow instructions, could sustain concentration, and suffered no emotional problems (Docket No. 11, p. 438 of 480). Dr. Layne reported Plaintiff could return to his prior employment and could emotionally "endure a demanding work schedule and tolerate demanding bosses and irritated customers" (Docket No. 11, p. 428 of 480). Dr. Layne assigned

Plaintiff a Global Assessment of Functioning ("GAF")[5] score of eighty-one (Docket No. 11, p. 427 of 480).

### c. JUNE 9, 2010

On June 9, 2010, Plaintiff underwent a psychological evaluation with Dr. Lee Howard, Ph.D ("Dr. Howard") (Docket No. 11, pp. 400-17 of 480). Plaintiff was on time for the evaluation and dressed appropriately (Docket No. 11, p. 410 of 480). His behavior and social presentation were normal/average (Docket No. 11, p. 410 of 480). Plaintiff reported feeling depressed twice a week for six hours, especially during the times his son was with his ex-wife (Docket No. 11, p. 406 of 480). Dr. Howard noted Plaintiff's mood and affect were generally within the normal range with no classic symptoms of depression (Docket No. 11, p. 410 of 480). Plaintiff reported crying spells two to three times per week, and recent suicidal ideation (Docket No. 11, p. 411 of 480).

Based on his evaluation, Dr. Howard found Plaintiff to be cognitively oriented with flowing, relevant, goal-directed, and coherent thoughts (Docket No. 11, p. 411 of 480). He had no auditory or visual hallucinations, paranoid ideation, or psychosis (Docket No. 11, p. 411 of 480). Plaintiff had good immediate memory but reduced long-term memory (Docket No. 11, p. 412 of 480). Plaintiff's concentration was variable (Docket No. 11, p. 412 of 480). Based on personality testing, Plaintiff displayed an "unusually high elevation" on the fake bad scale, which Dr. Howard noted was typical of individuals involved in litigation or who are seeking compensation (Docket No. 11, p. 412 of 480). Dr. Howard also administered a Minnesota Multiphasic Personality Inventory[6] ("MMPI"), for which Plaintiff achieved an unusually elevated score (Docket No. 412 of 480). According to Dr. Howard, this result is indicative of "high levels of symptom magnification and/or exaggeration" (Docket No. 11, p. 412 of 480). Plaintiff's scores were"suspicious" for a malingering tendency (Docket No. 11, p. 413 of 480).

Dr. Howard concluded Plaintiff did not display any classic symptoms of depression and did not suffer from MDD (Docket No. 11, pp. 414, 416 of 480). Plaintiff's self-report represented a "significant overpatholigizing of [his] current

---

[5] The Global Assessment of Functioning Scale is a 100-point scale that measures a patient's overall level of psychological, social, and occupational functioning on a hypothetical continuum. A score of eighty-one indicates absent or minimal symptoms, good functioning in all areas, interested and involved in a wide range of activities, socially effective, generally satisfied with life, no more than everyday problems or concerns. THE DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (hereinafter DSM-IV) 34 (Am. Psychiatric Ass'n) (4th ed. 1994).

[6] A questionnaire type of personality test in which the subject answers yes or no to questions covering physical health, sexual, religious, political, and social attributes, family and marital problems, etc., for a total of 550 items. The results are compared to the answers given by criterion groups. ATTORNEYS' DICTIONARY OF MEDICINE, M-75435 (2009).

clinical state" (Docket No. 11, p. 414 of 480). Dr. Howard assigned Plaintiff a GAF score of seventy[7] (Docket No. 11, p. 415 of 480).

### d. AUGUST 2, 2010

On August 2, 2010, Dr. Kuna reviewed the reports of both Drs. Layne and Howard (Docket No. 11, pp. 386-89 of 480). Dr. Kuna reported that, during Plaintiff's first psychological evaluation, there was no evidence of over-reporting, exaggeration, or malingering (Docket No. 11, p. 388 of 480). Plaintiff also returned for a follow-up interview on July 22, 2010 (Docket No. 11, p. 387 of 480). Plaintiff presented with continuing suicidal ideation and daily crying spells (Docket No. 11, pp. 387-88 of 480). Dr. Kuna reaffirmed his diagnosis of MDD (Docket No. 11, p. 389 of 480).

### e. SEPTEMBER 14, 2010

On September 14, 2010, Plaintiff underwent a Supplemental Functional Assessment at the request of the BWC (Docket No. 11, pp. 384-85 of 480). The examiner found Plaintiff suffered from untreated depression (Docket No. 11, p. 384 of 480). Plaintiff was severely limited in his ability to maintain his safety and the safety of others and moderately-severely limited in his ability to maintain control of his emotions (Docket No. 11, p. 385 of 480). He had moderate limitations in his ability to: (1) handle goals, objectives, and performance measures; (2) comprehend and follow instructions; (3) maintain an appropriate work pace; (4) respond appropriately to supervision; (5) generalize, evaluate, and make independent decisions without immediate supervision; (6) interact with customers; (7) accept and carry out responsibility for direction, control, and planning of tasks; (8) perform intellectually complex tasks; and (9) supervise or manage others (Docket No. 11, p. 385 of 480). Plaintiff had mild limitations with regard to his ability to: (1) perform activities of daily living; (2) perform simple and repetitive tasks; and (3) perform work where contact with others is minimal (Docket No. 11, p. 385 of 480).

## III. GUYER'S ARUGUMENTS

Guyer contends that the Magistrate Judge: 1) erroneously evaluated the side effects of his medications; 2) erred in concluding that the Commissioner's failure to give the opinion of treating physician Dr. Randall Bowman controlling weight was harmless error; 3) failed to properly evaluate the requirements for Guyer's sit/stand option; 4) erroneously construed Guyer's argument

---

[7] A score of seventy indicates some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well, has some meaningful interpersonal relationships. DSM-IV at 34.

regarding his ability to reach above his head; 5) failed to properly evaluate his credibility argument; and 6) erred in evaluating his arguments regarding the vocational expert's testimony. The Court concludes that the Commissioner's failure to determine whether Dr. Bowman's opinion was entitled to controlling weight was error, warranting a remand of Guyer's applications to the Commissioner for further proceedings.

The controlling decision on this issue is *Cole v. Astrue*, 661 F.3d 931 (6th Cir. 2011). In *Cole*, the court noted that the Commissioner has elected to impose certain standards on the treatment of "medical source evidence." *Cole*, 661 F.3d at 937; *see also* 20 C.F.R. § 404.1502. Under what is commonly known as the "treating physician rule," *Cole*, 661 F.3d at 937, the Commissioner requires that an administrative law judge (ALJ) give a treating physician's opinion controlling weight if it "'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'" *Cole*, 661 F.3d at 937 (quoting 20 C.F.R. § 404.1527(d)(2)). If the ALJ declines to give a treating physician's opinion controlling weight, the ALJ must then balance the following factors to determine what weight to give the opinion: 1) the length of the treatment relationship and the frequency of the examination; 2) the nature and extent of the treatment relationship; 3) the supportability of the opinion; 4) the consistency of the opinion with the record as a whole, and 5) the specialization of the treating source. *Cole*, 661 F.3d at 937 (citations omitted).

*Cole* noted that the Commissioner requires decision makers to "'always give good reasons in our notice of determination or decision for the weight we give [a] treating source's opinion.'" *Id*. (quoting 20 C.F.R. § 404.1527(d)(2)). The reasons must be supported by the evidence and

16

must be sufficiently specific to inform any subsequent reviewer of the weight given to the treating source's medical opinion, along with the reasons for that weight. *Id.* (citation omitted).

The ALJ in *Cole* found that a Dr. Vishnupad, one of Cole's several physicians, was Cole's treating psychiatrist. The ALJ accepted the doctor's diagnosis of major depression. The court noted that although the ALJ deemed the doctor's medical opinion to be deserving of controlling weight, the ALJ failed to explicitly address the weight given. *Id*. at 938. After accepting Dr. Vishnupad's diagnosis, the ALJ rejected the conclusions contained in the doctor's residual functional capacity assessment concerning the severity of Cole's impairments as they relate to work. The court found that the ALJ's failure to assign a specific weight to Dr. Vishnupad's assessment constituted reversible error. *Id*.

In this case, after reviewing Dr. Bowman's residual functional capacity assessment, the ALJ found that Dr. Bowman's opinion was supported by the medical evidence in the record. The ALJ also found that based on his status as a treating physician, Dr. Bowman's opinion was entitled to "great weight." (Docket No. 11, p. 63 of 480). As the Magistrate Judge noted in her report, Guyer was correct in arguing that the ALJ erred by failing to provide the necessary reasoning for not assigning Dr. Bowman's opinion controlling weight. (Docket No. 18, p. 28 of 39). Although the Magistrate Judge concluded that the error was harmless, this conclusion is incorrect under *Cole*. *Cole* stated that an error is harmless if:

> (1) a treating source's opinion is so patently deficient that the Commissioner could not possibly credit it; (2) if the Commissioner adopts the opinion of the treating source or makes findings consistent with the opinion; or (3) where the Commissioner has met the goal of [20 C.F.R.] § [404.]1527(d)(2) . . . even though she has not complied with the terms of the regulation.

*Cole*, 661 F.3d at 940.

17

Here, the ALJ's decision cannot be saved under any of the three factors set forth in *Cole*. The ALJ found that Dr. Bowman's opinion was "wholly consistent" with the medical evidence in the record and with the doctor's residual functional capacity assessment. (Docket 11, p. 63 of 480). Thus, by embracing Dr. Bowman's opinion, the "patently deficient" factor discussed in *Cole* is not applicable.

The second factor, adopting the opinion of the treating source or making findings consistent with the opinion, is also not applicable. The Magistrate Judge correctly noted that, "if the Commissioner adopts the opinion of the treating source or makes findings consistent with the opinion, it may be irrelevant that the ALJ did not give weight to the treating physician's opinion, and the failure to give reasons for not giving such weight is correspondingly irrelevant." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 547 (6th Cir. 2004); *accord Cole*, 661 F.3d at 940.

The record establishes that both the ALJ and Dr. Bowman reached the following conclusions concerning Guyer's residual functional capacity: 1) Guyer can lift/carry, push/pull ten pounds frequently and twenty pounds occasionally; 2) Guyer can stand for four hours; 3) Guyer can walk for two hours; and 4) Guyer requires a sit/stand option. (Docket No. 11, pp. 60, 471-75 of 480). The ALJ found that Guyer could sit for six hours during an eight-hour workday, whereas Dr. Bowman opined that Guyer could sit for a full eight hours. (Docket No. 11, pp. 60, 472 of 480). The ALJ also found that Guyer was limited to only occasional overhead reaching of no more than five pounds. (Docket No. 11, p. 60 of 480). Dr. Bowman did not assign Guyer any overhead reaching limitations. (Docket No. 11, p. 474 of 480). Dr. Bowman found Guyer could never squat, crawl, or climb, whereas the ALJ limited Guyer to occasional stooping, crouching, kneeling, and crawling. (Docket No. 11, pp. 60, 474 of 480). Dr. Bowman also included

environmental limitations, whereas the ALJ did not. (Docket No. 11, pp. 60, 475 of 480). The ALJ limited Guyer to simple, routine work with only occasional interaction with the general public. (Docket No. 11, p. 60 of 480).

The differences between Dr. Bowman's restrictions and the ALJ's restrictions fail to render the ALJ's error harmless under *Cole*. Although the ALJ embraced Dr. Bowman's restrictions, the ALJ found that Guyer could occasionally climb, kneel, and crawl, restrictions that Dr. Bowman prohibited. The ALJ's failure to discuss why he did not adopt these restrictions, while adopting other restrictions, is the exact problem *Cole* finds to be a violation of the Commissioner's rules and regulations. *See Cole*, 661 F.3d at 940.

If this error was not enough, the ALJ completely ignored Dr. Bowman's environmental restrictions. Dr. Bowman found that Guyer was totally prohibited from engaging in activities involving unprotected heights. In addition, Guyer was moderately restricted from activities involving moving machinery; exposure to changes in temperature and humidity; driving automotive equipment; and exposure to dust, fumes, and gases. Although the Magistrate Judge categorizes these differences as "minor," (Docket No. 18, p. 29 of 39), these restrictions are significant and should have been explicitly discussed by the ALJ in his opinion. By failing to address the significant environmental restrictions of Dr. Bowman's residual functional capacity assessment, under *Cole*, the Commissioner's decision is not supported by substantial evidence. *Id*.

Finally, the last factor of *Cole's* harmless error analysis, the satisfaction of § 404.1527(d)(2), also fails to save the ALJ's decision. Because the ALJ neglects to explain why he did not embrace all of Dr. Bowman's restrictions after finding the doctor's opinion to be supported by the medical evidence, the Court is without a clear understanding of why the ALJ

credited some, but not all of Dr. Bowman's restrictions. Thus, the goal of § 404.1527(d)(2) has not been satisfied. *Id*.

### IV.  CONCLUSION

Because the Commissioner failed to follow the agency's rules and regulations regarding the evaluation of Dr. Bowman's opinion, this error of law means that the Commissioner's decision is not supported by substantial evidence. *Id*. at 937, 939–40.  Accordingly, the Magistrate Judge's summary of the record is adopted; but this Court will not adopt the Magistrate Judge's conclusions of law.  Guyer's applications for benefits are remanded to the Commissioner for further proceedings consistent with this opinion.  Because the Commissioner will be required to reevaluate Guyer's applications, the Court will not address Guyer's remaining objections to the Magistrate Judge's report as the reasons for the objections may be rendered moot by the Commissioner's new decision.

IT IS SO ORDERED.

          s/ *David A. Katz*
          DAVID A. KATZ
          U. S. DISTRICT JUDGE